Jeffrey I. Shinder (JS-5719)
Gordon Schnell (GS-2567)
Lloyd Constantine (LC-8465)
Reiko Cyr (RC-4323)
**CONSTANTINE & PARTNERS**
477 Madison Avenue
New York, New York 10022
Tel: (212) 350-2700
Fax: (212) 350-2701

Attorneys for Plaintiff
**PAYCOM BILLING SERVICES, INC.**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 05 2003 ★

03 6150

TRAGER, J.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAYCOM BILLING SERVICES, INC. | Case No. |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| vs. | |
| MASTERCARD INTERNATIONAL, INC. | |
| Defendant | |

Plaintiff Paycom Billing Services, Inc. ("Paycom"), by its undersigned attorneys herein, allege for its complaint against MasterCard International, Inc. ("MasterCard"), upon knowledge with respect to its own acts and upon information and belief with respect to all other matters, as follows:

## I. INTRODUCTION

1.      Paycom is a merchant that sells access to password protected websites that its customers offer to consumers over the Internet. Since Paycom started doing business in 1997, it has needed to accept MasterCard credit card transactions to remain viable. This has given MasterCard substantial market power over Paycom.

2.      MasterCard possesses this power over virtually all merchants, and particularly over card-not-present ("CNP") merchants, such as Internet or mail-order/telephone-order merchants, that sell goods and/or services to consumers without face-to-face interaction. MasterCard's overwhelming power over CNP merchants was highlighted by the Court in the recent government antitrust case against MasterCard: "The reality is that Visa and MasterCard are able to charge substantially different prices for those hundreds of thousands of [CNP] merchants who must take credit cards at any price because their customers insist on using those cards." *United States v. Visa*, 163 F.Supp.2d 322, 340 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d. Cir. 2003) (hereinafter "*U.S. v. Visa/MasterCard*").

3.      MasterCard has maintained, abused and exacerbated this market power over CNP merchants by engaging in numerous exclusionary acts which independently and collectively have injured Paycom and harmed competition.

1

35315.2

4.      First, MasterCard has used its rules and policies to prevent its members, which include virtually every major bank in the country, from dealing with competing payment networks.  These rules have suppressed competition in the general purpose credit and debit markets, and significantly limited the number of payment options available to Paycom as alternatives to MasterCard credit cards.

5.      Second, through its chargeback system -- which forces merchants to return funds they have received for completed transactions that have been authorized by MasterCard or its member banks -- MasterCard has implemented a *per se* unlawful agreement with its members. Under this agreement, MasterCard member banks, which are competitors, have agreed not to compete regarding the costs of, and allocation of risk for, fraud and chargebacks in the CNP merchant environment.  Instead they have combined and conspired to force CNP merchants to pay all the costs and bear all of the risks associated with CNP fraud.

6.      Third,  MasterCard has conspired with its member banks to impose on CNP merchants a regime of fixed penalties and fines that are designed to extract supracompetitive chargeback revenues from CNP merchants.

7.      Fourth, MasterCard has implemented a *per se* unlawful market allocation scheme that further limits the competitive choices available to CNP merchants.  Under MasterCard's cross-border acquiring rules, non-U.S. banks are prohibited from competing in the U.S. to provide acquiring services to merchants.  Accordingly, firms like Paycom have severely limited options in choosing acquiring banks and must accept MasterCard acquiring service contracts on terms less favorable than if competition from non-U.S. acquirers were permitted.

2

8.   Fifth, MasterCard has adopted a set of Internet merchant qualification rules that threaten to force Paycom out of business if it does not abandon its current, and highly successful, business model. These rules are a pretext by MasterCard to force Paycom to cede its website customers to MasterCard acquiring banks who directly compete with Paycom, and to increase the supracompetitive chargeback revenues that MasterCard and its members receive from Internet merchants. They also are designed to quash the threat posed by companies like Paycom of developing a payment form and/or brand that directly competes against MasterCard. These rules constitute a *per se* unlawful group boycott of Paycom.

9.   This campaign of predation and exclusionary conduct has substantially damaged Paycom's business, costing it tens of millions of dollars. If left unchecked, this conduct will destroy Paycom's business.

10.   MasterCard's unlawful conduct also has harmed competition and consumers. By insulating MasterCard member banks from competition regarding the costs of, and allocation of risks for, CNP fraud and chargebacks, and by providing MasterCard and its members supracompetitive and exorbitant chargeback and interchange fees, MasterCard has perversely reduced the incentives that MasterCard and its member banks otherwise would have had to reduce CNP fraud. MasterCard and its member banks, unsurprisingly, have failed to take reasonable measures to reduce CNP fraud, which they instead treat as a profit center. Consumers have experienced more CNP fraud and higher prices for CNP transactions, as a result. And, many consumers remain unwilling to use their MasterCard credit and debit cards over the Internet because of security concerns, reducing the sales of Paycom and other Internet merchants and suppressing the overall growth of the Internet as a vehicle for consumers to make retail

3

purchases. Finally, this reduction in output has been compounded by the fact that MasterCard's unlawful conduct forces CNP merchants to turn away billions of dollars of potentially legitimate MasterCard transactions.

11.     MasterCard's exclusionary, predatory and anticompetitive practices violate Sections 1 and 2 of the Sherman Act. To redress these ongoing violations of federal antitrust law, Paycom seeks treble damages and equitable relief.

## II.  JURISDICTION AND VENUE

12.     This complaint is filed under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages for such violations. This Court has jurisdiction of the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201 and 2202.

13.     Defendant MasterCard transacts business and is found in this District. Tens of thousands of retail establishments located in this District accept MasterCard credit and debit transactions. Hundreds of banks issue and/or acquire MasterCard credit and debit cards in this District. The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District. Venue in this District is proper under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22, and 26.

## III.  DEFINITIONS

14.     "General purpose credit card" means a payment card that allows cardholders to pay for goods and services at a wide variety of merchant locations by accessing a line of credit extended to the cardholder by the financial institution that issued the card. MasterCard credit

4

cards, Visa credit cards, American Express Optima credit cards and Discover credit cards are examples of general purpose credit cards.

15.     "General purpose debit card" means a payment card that allows cardholders to pay for goods and services at a wide variety of merchant locations by accessing the cardholder's asset account, usually a demand deposit account ("DDA") at a bank.  MasterCard's off-line signature-based debit product, sometimes referred to as MasterMoney or Debit MasterCard, is a general purpose debit card.

16.     "T & E card" means a payment card that typically has no pre-set spending limit where the cardholder is required to pay the card balance in full each month.  American Express "charge cards" (as contrasted with its revolving credit cards), and Diner's Club charge cards are T & E cards.

17.     "Issuer' or 'issuing bank" means a bank or other financial institution that issues payment cards to consumers to be used to pay for goods and services at merchant locations.

18.     "MasterCard issuing bank" means a bank or other financial institution member of MasterCard that issues MasterCard branded payment cards to consumers to be used to pay for goods and services at merchant locations.

19.     "Acquirer' or 'acquiring bank" means a bank or other financial institution that enters into agreements with merchants that enables the merchant to accept payment cards for payment for goods and services.

20.     "MasterCard acquiring bank" means a bank or other financial institution member of MasterCard that enters into agreements with merchants that enables the merchant to accept MasterCard branded payment cards for payment for goods and services.

5

21.    "Interchange fee" means a fee that is fixed by MasterCard for the benefit of its issuing member banks that works as follows: Bank A issues a MasterCard credit card to Consumer X, who purchases a garment for $100 at Store Y, which was "acquired" for MasterCard by Bank B.  Under MasterCard's rules, Bank B must pay Bank A an interchange fee of, for example, 2.00% of the transaction, which would equal $2.00.  Bank B will charge Store Y a "Merchant Service Fee" (usually called a "discount fee"), and in addition to Bank B's charges for processing services to the merchant, this fee will include the mandated interchange fee and other fees that MasterCard's rules require Bank B to pay MasterCard on all MasterCard transactions.  Thus, Bank B may charge a Merchant Service Fee or discount fee of 3.50% of the transaction amount (or $3.50) to Store Y.  When Store Y presents Consumer X's $100 MasterCard transaction to Bank B, for "clearance and settlement", Bank A will send $98 to Bank B (retaining the $2.00 interchange fee), Bank B will credit Store Y's account for $96.50 (retaining the $1.50 balance of the Merchant Service Fee).  MasterCard interchange fees and other mandated fees, such as assessments, are directly passed along to the merchant, along with the balance of the discount fee.

22.    "Merchant Service Fee" or "discount fee" means the fee charged by MasterCard acquiring banks to their merchant clients for acquiring MasterCard transactions as described and discussed in the above definition of "interchange fee."

23.    "Authorization" means the process in the MasterCard system whereby an electronic message is sent by the acquiring bank to MasterCard or a MasterCard issuing bank to confirm that the cardholder has sufficient funds or credit available to complete the transaction, and that the individual making the transaction has provided sufficient information to identify

6

themselves as authorized to use the card. For example, when a MasterCard credit card holder makes a purchase at a CNP merchant, the acquiring bank will electronically send an authorization message to MasterCard or the issuing bank. When MasterCard or the issuing bank receives the message they will confirm that the cardholder has sufficient credit available and is otherwise authorized to make the purchase. If the cardholder does have sufficient credit available and is otherwise authorized to use the card, MasterCard or the issuer will send an electronic message back to the acquirer authorizing the transaction. If the cardholder does not have sufficient credit available or is not authorized to use the card, the transaction will be declined by MasterCard or the issuer. The authorization (or decline) message is then sent by the acquirer to the CNP merchant, who then permits the cardholder to complete the transaction if it has been authorized.

24.     "Clearance and settlement" means the process in the MasterCard system whereby during the day or at the end of each day merchants aggregate their MasterCard transactions in batches and send them to their acquiring banks. The acquirers then send these transactions through the MasterCard system to the various issuers whose cardholders made the transactions. The transaction amount (less the interchange) is then sent by the issuer through the MasterCard system to acquirers, who (after deducting their fees) place the money in merchant accounts.

25.     "Brick-and-mortar merchant" refers to merchants that sell goods and/or services to consumers where the consumer and the payment card being used for payment are typically present at the point-of-sale.

26.     "CNP merchant" refers to merchants that sell goods and/or services to consumers without face-to-face interaction and who therefore have no opportunity to manually inspect or

7

handle the payment card that the consumer uses for payment. Examples of CNP merchants include Internet merchants and mail-order/telephone order merchants.

27.    "CNP transaction" means a payment transaction made at a CNP merchant.

28.    "Merchant credit" means a circumstance when a merchant provides a MasterCard cardholder a refund, after the cardholder complains directly to the merchant about the transaction, by processing the transaction as a credit through the MasterCard system.

29.    "Chargeback" means a circumstance when a payment card transaction that has been cleared and settled is reversed by the issuer and the funds are taken out of the merchant's account and paid back to the issuing bank. The following illustration describes how chargebacks typically work in the MasterCard system: Chargebacks are initiated by issuers when a cardholder has disputed the validity of a transaction that appears on his/her credit card statement. They may also be initiated as "automatic chargebacks" by issuers who are "gaming" the chargeback system, even though their customer has not disputed the transaction. When a chargeback has been initiated, the issuing bank will send the chargeback to the merchant's acquiring bank. The total amount of the transaction (less the interchange fee) is then debited from the acquiring bank's account with MasterCard and credited to the issuing bank. Within days, the acquiring bank often removes the full amount of the transaction from the merchant's account. If the merchant wants to challenge or re-present the chargeback, it must verify the validity of the transaction by producing the sales receipt that the cardholder signed at the point-of-sale. If the merchant provides such verification within the stipulated period of time, the chargeback will be re-presented for clearance through the system and the funds for the goods and/or services will be restored to the merchant's account. If the merchant cannot provide such verification within the

8

35315.2

stipulated period of time, the issuer will keep the transaction amount and in most cases return it to the cardholder and the acquirer will keep the discount fee and any chargeback fees it imposes on the merchant. Because the chargeback system is based on the merchant's ability to provide a signed sales receipt, it provides brick-and-mortar merchants an effective means of successfully re-presenting chargebacks that does not exist for CNP merchants, who cannot obtain a signature.

30.    "Re-present" or "re-presentment" means when the merchant challenges the validity of a chargeback. Brick-and-mortar merchants can re-present chargebacks by simply producing the sales receipt that the cardholder signed at the point-of-sale. If the merchant provides such verification within the stipulated period of time, the chargeback will be re-presented for clearance through the system and the funds for the goods and/or services will be restored to the merchant's account. In contrast, under MasterCard's anticompetitive chargeback system, CNP merchants have virtually no means of successfully re-presenting chargebacks.

31.    "Automatic chargeback" means a chargeback that has been initiated by issuers, even though the cardholder has not disputed the transaction. For example, certain MasterCard issuers choose to chargeback CNP transactions randomly merely to improperly gain additional revenues. The following example explains how such chargebacks can improperly benefit issuers. Consumer X purchases good and/or services from Internet Merchant Y using a credit card issued by MasterCard Issuing Bank A. Merchant Y receives the full amount of the transaction less the merchant discount. Bank A charges Consumer X for this transaction. Consumer X pays the full amount of the transaction (with a finance charge if the loan is revolved over time) to Bank A. Bank A chooses to chargeback the transaction, even though Consumer X has not disputed its validity. Because CNP merchants have little ability to successfully re-present CNP transactions,

9

the chargeback will result in the full amount of the transaction being taken from Merchant Y and given back to Bank A. Thus, Bank A may receive the full amount of the transaction price, even though the merchant provided a service for which the cardholder willingly made payment (and potentially paid a finance charge).

32.     "Chargeback Ratio" means the ratio of MasterCard chargebacks received by a particular merchant in a given month to the total number and/or dollar volume of MasterCard sales transactions processed by that merchant in that month.

33.     "Chargeback Threshold" means a Chargeback Ratio that is established by MasterCard rules, regulations or policies. If a merchant's Chargeback Ratio exceeds the applicable Chargeback Threshold, MasterCard imposes on the merchant a series of fines and/or penalties.

34.     "Retrieval request" means a request by an issuer that the merchant retrieve the sales receipt that the cardholder signed at the point-of-sale to make the purchase.

35.     "Merchant account" means the account merchants establish with their acquiring bank to receive payments (less the discount and other fees) for MasterCard transactions after those transactions have been cleared and settled through the MasterCard system.

36.     "I didn't do it" fraud means fraud that is perpetrated by cardholders who, using their own cards, made legitimate CNP transactions and then denied having made the transactions. For example, a consumer buys a membership to an Internet adult site. When the charge appears on his monthly statement, he denies having ever made the transaction. This typically results in a chargeback, which forces the merchant to return the transaction amount to the issuing bank, even though the transaction was legitimate. By contrast, with real or actual fraud (*ie.* non "I didn't do

35315.2

it" fraud), the transaction is made by someone who is not authorized to use the card, typically a crook or hacker who has stolen the identifying card information. MasterCard admits that 80% of CNP fraud is "I didn't do it" fraud.

## IV. THE PARTIES

37.     Plaintiff Paycom is a Delaware corporation with its principal place of business in Marina del Rey, California. Paycom sometimes does business as "Paycom.net," "Epoch Transaction Services," or "Epoch Systems," and is sometimes referred to as "Paycom, Inc." Paycom operates exclusively on the Internet. Paycom is a merchant that sells access to password protected websites that its customers offer to consumers over the Internet.

38.     Defendant MasterCard is a Delaware corporation with its principal place of business in Purchase, New York. MasterCard is a national bank card association whose members include more than 25,000 banks, including virtually every major bank in the United States. MasterCard is doing business and transacts business within this District. MasterCard has advertised itself as the largest credit card network in the United States.

## V. CO-CONSPIRATORS

39.     Various firms, corporations, organizations and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies. MasterCard issuing and acquiring member banks have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies. Certain MasterCard member banks that are members of the MasterCard board of directors or members of influential MasterCard committees adopted and mandated the anticompetitive conduct described in this Complaint. All MasterCard

11

35315.2

member banks have received supracompetitive interchange and chargeback revenue from this anticompetitive conduct.

## VI. FACTUAL ALLEGATIONS

### A.    Paycom's Business

40.    Paycom is a merchant that sells access to password protected websites that its customers offer to consumers over the Internet. Paycom enters into contracts with its website customers that authorize Paycom to make sales for their sites and accept MasterCard, Visa and other forms of electronic payment for those sales. Paycom then submits the card transactions for authorization and settlement under Paycom's merchant account with its acquiring bank. Paycom then passes along to its website customers the amount of the transactions (less Paycom's fees) that settle through the MasterCard and Visa systems.

41.    Paycom has been in business since 1997 when the Internet's commercial potential was just beginning to flourish. Paycom has grown over the years by providing a value-added service to its website customers who lack the technical expertise and resources to directly accept MasterCard and Visa transactions and manage the fraud that might otherwise be present in the absence of Paycom's sophisticated fraud screening technologies.

42.    A substantial percentage of the website customers for which Paycom processes credit card transactions deliver digital content for the online "adult" industry. Paycom does not produce, own or manage this digital content. Rather, Paycom sells access to the content in the form of recurring monthly memberships, account ID's and passwords that are given to consumers to enable them to view the content on the websites of Paycom's customers. Paycom's website customers also include, among others, a municipal golf course, charities, insurance companies,

12

35315.2

publishing companies, Internet hosting companies, companies that sell downloadable software, and companies that provide other digital content such as sports forecasting and music.

43.     Paycom performs an extensive compliance check on all potential website customers.  For example, Paycom's compliance department verifies that the customer's website functions properly, that all appropriate disclosures are displayed, and that the website complies with MasterCard and Visa rules (*ie.* the Visa and MasterCard logos are not displayed on the website customer's site as they must be displayed only on Paycom's site).  Paycom also utilizes a corporate underwriting process to verify the legitimacy of its website customers' corporate structure and their principals.  Paycom's business model is similar to a ticket agent (*ie.* TicketMaster) which sells access to a number of different venues.

44.     One of the principal services Paycom provides to its website customers is its sophisticated fraud protection systems.  These systems include the use of: (i) negative files of compromised card numbers against which transactions are checked; (ii) bank identification number ("BIN") tables to block certain BINs from countries or banks that have exhibited high fraud or chargeback rates; and (iii) velocity monitoring programs to detect unusual cardholder activity.  Paycom blocks cards issued under roughly 1000 BINs which have a disproportionate amount of fraud associated with them.  Paycom also blocks transactions from roughly 60 countries, which are especially prone to CNP fraud.

45.     While Paycom's website customers supply the services that consumers ultimately purchase, Paycom is in all relevant respects the merchant that makes the sale:

        a.     When consumers are ready to pay, they are directed immediately to Paycom's secure website where the sale is completed;

13

          b.      Once consumers reach Paycom's website, they are presented with a description of the proposed purchase, a confirmation of the sale price, disclosures regarding the nature of the purchase and options regarding the sale price, similar to the process that occurs when adult movies are purchased at hotels;

          c.      The consumer then decides whether or not to complete the purchase from Paycom;

          d.      Paycom (not the website customer) decides whether or not to complete the sale with that consumer;

          e.      Paycom (not the website customer) delivers the appropriate account ID and password information to the consumer;

          f.      Paycom (not the website customer) bills the consumer's payment card or account;

          g.      Paycom (not the website customer) sends an email confirming the payment card sale to the consumer; and

          h.      Paycom (not the website customer) determines when a consumer's purchase should be cancelled.

      46.      To provide immediate service to the millions of consumers who purchase access to the digital content provided by its website customers, Paycom operates a customer service center 24 hours a day, 365 days a year. Paycom's customer service representatives receive four weeks of training before they start to field calls or respond to emails. To ensure continuing high quality service once its customer service representatives are on the job, Paycom's Quality Assurance Department monitors their performance. Because Paycom receives calls from around

14

the world, Paycom provides international toll-free telephone numbers and the service center is

equipped to answer inquiries in 12 different languages. Because of Paycom's rigorous standards,

over 90% of calls are answered within 30 seconds, and email messages are responded to within

10 minutes. On average, Paycom's call center fields approximately 4,500 calls and emails per

day. Paycom also has a special department to field inquiries from banks.

47. Paycom accepts various forms of electronic payment including credit

transactions, debit transactions and automated clearing house ("ACH") transactions. Paycom

does not accept cash or paper checks. Because of MasterCard's substantial market power in the

general purpose credit (or credit and T & E) card services markets, Paycom must accept

MasterCard credit card transactions to remain viable, as discussed more fully below. Paycom

competes directly with MasterCard acquiring member banks in providing payment processing

services to Internet merchants.

**B.    Relevant Markets**

48. General purpose credit card services to merchants is the product dimension of a

relevant market. The geographic dimension of this market is the United States. Credit cards

permit consumers to borrow money from the issuing bank and repay and revolve the loan over

time. Credit cards therefore generate substantial incremental or additional sales for merchants.

Consumers who pay with credit cards either want or need to borrow money, which they can repay

and revolve over time. Because other forms of payment, including T & E cards, debit cards,

checks and cash, do not permit consumers to borrow money and repay and revolve the loan over

time, they are not reasonably interchangeable with credit cards for consumers. Because

15

merchants do not receive similar incremental sales from other forms of payment, those forms of payment are not reasonably interchangeable with general purpose credit cards.

49.    General purpose credit and T & E card services to merchants is the product dimension of a relevant market. The geographic dimension of this market is the United States. Both credit cards and T & E cards permit a consumer to borrow the money for a retail purchase from issuing banks and to repay the loan without incurring interest charges during a grace period. Consumers who pay with credit and T & E cards either want or need to borrow money which they can repay to the issuing bank, without interest, according to the terms of their agreement with the bank. Other forms of payment are not reasonably interchangeable with credit and T & E cards for consumers. Other forms of payment are also not reasonably interchange with credit and T & E cards for merchants.

50.    In *U.S. v. Visa/MasterCard* the Court found that "general purpose card network services [consisting of general purpose credit cards and T & E cards] ... constitute a product market because merchant consumers exhibit little price sensitivity and the networks provide core services that cannot reasonably be replaced by other sources." 163 F.Supp.2d at 338. Similarly, the Court in *In Re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ("*In Re Visa Check*") found that "there is no genuine issue of material fact ... that the relevant market, at its broadest, is the provision of general purpose credit and charge card services." The *In Re Visa Check* Court also noted that "the evidence suggests an even narrower product market, ie. general purpose credit card services alone."

51.    General purpose debit card services to merchants is the product dimension of a relevant market. The geographic dimension of this market is the United States. Debit cards

16                                                 3531S.2

permit consumers to pay for purchases with funds from their asset accounts. Consumers who pay with debit cards either want or need to make contemporaneous payment with funds from their asset accounts. They do not want to borrow money or cannot do so. In addition, they want to avoid the inconvenience of writing a paper check or carrying substantial amounts of cash with them for purchases. For these reasons, credit cards, T & E cards, checks and cash are not reasonably interchangeable with debit cards for consumers. Credit cards, T & E cards, checks and cash are also not reasonably interchangeable with debit cards for merchants. As the Court held in *In Re Visa Check*, "debit card services is a well-defined submarket characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole."

52.     The market for payment card processing services to merchants is the product dimension of a relevant market. The geographic dimension of this market is the United States. These services are necessary for merchants to accept credit and other payment card transactions, and are provided by MasterCard acquiring banks, and other payment processors, such as Paycom.

53.     The market for payment card processing services for Internet merchants is the product dimension of a relevant market. These service are necessary for Internet merchants to accept credit and other payment card transactions, and are provided by MasterCard acquiring banks, and other Internet payment processors, such as Paycom. Internet merchants are substantially more reliant on electronic transactions than are brick-and-mortar merchants. MasterCard imposes more onerous capital requirements on acquirers that contract with Internet merchants, limiting the number of acquirers that can deal with these merchants. The provision of payment card processing services for Internet merchants requires specialized equipment and

35315.2

knowhow not required in processing for brick-and-mortar merchants. For example, payment processors for Internet merchants must ensure that the merchants website equipment is functional and that complex security systems have been implemented. Payment processing for Internet merchants also requires a highly complex back-office operation to provide customer service systems and risk management. Because of MasterCard's cross-border acquiring rules, the geographic dimension of this market is the United States.

## C.   MasterCard's Substantial Market Power in the General Purpose Credit and/or Credit and T & E Markets

### 1.   MasterCard's Individual Market Power

54.    MasterCard has possessed substantial market power in the general purpose credit and/or credit and T & E markets throughout the relevant damages period. MasterCard credit cards are the primary or only general purpose credit cards for tens of millions of consumers in the United States. Consequently, accepting MasterCard credit cards is a competitive necessity for virtually any merchant that accepts credit cards. This necessity is even greater for Internet merchants such as Paycom that are almost completely reliant on credit cards for payments and who are particularly vulnerable to losing sales and website customers if consumers cannot use MasterCard credit cards.

55.    The surest sign of MasterCard's substantial market power over merchants is its ability to continually raise the price merchants pay for accepting MasterCard credit cards without losing any merchant acceptance. Over the past decade, MasterCard has repeatedly raised the interchange fees paid by merchants. Yet the number of merchants accepting MasterCard credit

18

cards continues to increase. Once a merchant begins to accept MasterCard credit cards it is virtually impossible for it to stop, and very few, if any, have.

56.     This evidence of MasterCard's market power was highlighted by the Court in *U.S. v. Visa/MasterCard*. "MasterCard [has] recently raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result." 163 F.Supp.2d at 340. The inability of merchants to stop accepting MasterCard credit cards, when faced with recurring, significant non-transitory price increases, demonstrates MasterCard's substantial and enduring market power.

57.     MasterCard's price discrimination between classes of merchants also demonstrates its substantial market power. MasterCard generally charges CNP merchants, such as Paycom, higher interchange rates than it charges brick-and-mortar merchants. In *U.S. v. Visa/MasterCard*, the Court found that MasterCard charges higher prices to these merchants because of their greater reliance on MasterCard credit cards. "[MasterCard's and Visa's] ability to price discriminate also illustrates their market power. Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards... Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick-and-mortar' merchants. [MasterCard and Visa] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions." 163 F.Supp.2d at 340-41. Through its chargeback fine and

19

penalty programs (which are discussed more fully below), MasterCard has further price-discriminated against a subset of CNP merchants.

58.     The extent to which millions of merchants are subjected to MasterCard's market power is further evidenced by MasterCard's refusal to provide its operating regulations to merchants.  MasterCard rules require acquiring banks to incorporate by reference MasterCard's operating regulations -- which include virtually all of the chargeback rules and policies detailed in this Complaint -- into their contracts with merchants.  Yet, MasterCard prohibits the dissemination of these rules to merchants.  As a result, merchants are compelled to sign contracts for MasterCard acceptance that require merchants to abide by rules and regulations that are neither detailed in the contract nor provided to the merchant.  When Paycom asked MasterCard acquiring banks for these rules and regulations, it was told that it could not see them.  This further demonstrates the substantial market power MasterCard exercises over merchants.

59.     MasterCard's substantial market power is increasing as the number of MasterCard credit cards in circulation has steadily increased.  As of mid-year 2003, MasterCard had 269 million credit cards in circulation in the United States.

60.     Because of MasterCard's substantial market power, Paycom cannot remain viable without accepting MasterCard credit cards.  Paycom's business would be destroyed if it stopped accepting MasterCard credit cards.  If Paycom did not accept MasterCard credit card transactions, consumers would readily switch to Paycom's competitors on the Internet, as doing so would impose almost no inconvenience on consumers who can instantly click onto a competitor's website.  At the same time, Paycom's website customers would quickly switch to Paycom's competitors who did accept MasterCard credit card transactions.  These factors give

35315.2

MasterCard overwhelming power over Paycom. And, as discussed more fully below,

MasterCard has continually exercised, abused and strengthened that power with a variety of

anticompetitive acts, including its Competitive Programs Policy; *per se* unlawful agreement with

its members not to compete regarding the costs of, and allocation of risk for, CNP fraud and

chargebacks; regime of fixed chargeback fines and penalties; cross-border acquiring rules and

Internet Merchant Qualification Mandates.

        2.      MasterCard's Joint Market Power With Visa

        61.      MasterCard also has and exercises substantial market power jointly with Visa.

        62.      MasterCard and Visa (collectively, the "Associations") are national bank card

associations whose members include banks, regional banking associations and other financial

institutions. Under so-called duality, banks can be members of both MasterCard and Visa and

issue both brands of payment cards. In addition, banks can simultaneously participate in the

governance structure of both Associations. For example, many banks have sat on the Visa board

of directors and participated at the same time on influential MasterCard committees, such as the

interchange and business committees. Many banks also have sat on the MasterCard board and

participated at the same time on influential Visa committees.

        63.      Under duality, almost every major bank in the United States is a member of both

MasterCard and Visa, and there is currently more than a 95% overlap in the Associations'

memberships. MasterCard bank members collectively fix MasterCard's interchange fees and

contemporaneously, acting as Visa members, they collectively fix Visa's interchange fees. For

years, the Associations have moved in lockstep with respect to their interchange rates. They have

implemented substantial interchange rate increases in parallel, and have engaged in parallel price

35315.2

discrimination by simultaneously creating special tiers for certain classes of merchants (*ie.* supermarkets and automated fuel dispensers).

64.   MasterCard member banks also collectively set MasterCard's chargeback program and fix the associated fines and penalties. And, contemporaneously, acting as Visa members, they set Visa's chargeback programs, and fix Visa's chargeback fines and penalties. As with interchange fees, the Associations have, in many cases, implemented their chargeback rules and fees in parallel. Most recently, in the U.S., Visa lowered its Chargeback Threshold from 2.5% to 1% for certain CNP merchant categories, matching the threshold imposed by MasterCard.

65.   Under duality, MasterCard and Visa members "acquire" merchants for both MasterCard and Visa. Virtually all acquirers in the United States are "dual" as they acquire merchants for both MasterCard and Visa. Virtually every merchant that accepts MasterCard payment cards also accepts Visa payment cards. And virtually every merchant that accepts Visa payment cards also accepts MasterCard payment cards. In many cases, dual acquiring member banks blend the interchange and other fees set by MasterCard and Visa, thereby nullifying any price competition for these merchants between the Associations.

66.   In *U.S. v. Visa/MasterCard*, the Court concluded that it was appropriate to consider MasterCard's and Visa's market power both individually and collectively when determining their respective market power. In so holding, the Court found that MasterCard, individually and collectively with Visa, possessed and wielded market power over merchants in the general purpose credit and T & E market. According to the Court, "Visa and MasterCard together control over 73% of the volume of transactions on general purpose cards [consisting of

35315.2

credit and T & E cards] in the United States.  In terms of cards issued, they control about 85% of the market."  *U.S. v. Visa/MasterCard*, 163 F.Supp. at 341.

67.     In fact, the Court in *U.S. v. Visa/MasterCard* summarized MasterCard's (and Visa's) market power as follows: "Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both defendants have market power in the general purpose credit network services market [consisting of credit and T & E cards], whether measured jointly or separately; furthermore, [the government] has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers."  163 F.Supp.2d at 342.

**D.      MasterCard's Anticompetitive Conduct**

68.     MasterCard has maintained, abused and exacerbated its substantial market power over merchants by engaging in a wide variety of exclusionary acts which independently and collectively have injured Paycom and harmed competition.  This conduct includes MasterCard's implementation of: (i) rules and policies that have suppressed competition in the general purpose credit (or credit and T & E card) market and the general purpose debit card market; (ii) a *per se* unlawful agreement not to compete with respect to the costs of, and allocation of risk for, CNP fraud and chargebacks; (iii) a regime of fixed fines and penalties that MasterCard and its members force CNP merchants to pay; (iv) a market allocation scheme through its cross-border acquiring rules; and (iv) a group boycott through its Internet Merchant Qualification Mandates.

1.      The Competitive Programs Policy

69.     In 1996, MasterCard instituted its Competitive Programs Policy (the "CPP").  The CPP prohibited MasterCard members from issuing the cards of competing general purpose credit

23                                                      35315.2

or T & E card programs. Under the CPP, MasterCard members could continue to issue Visa credit cards as Visa was specifically not covered by the policy. The CPP mirrored Visa's By-Law 2.10(e), which prevented Visa members from issuing cards of networks deemed competitive with Visa. Visa By-Law 2.10(e) excluded MasterCard from the definition of competing networks. As such, MasterCard and Visa's rules explicitly state that they do not compete, further demonstrating why MasterCard's substantial market power should be measured individually and collectively with Visa.

70.    The CPP has harmed competition in the general purpose credit (or credit and T & E) market in violation of Section 1 of the Sherman Act. In *U.S. v. Visa/MasterCard*, the Court found that the CPP violated Section 1 by restraining "competition in the network market [consisting of credit and T & E cards] because [it] prevent[ed] American Express and Discover from offering network services to the consumers of those services, the members of the Visa and MasterCard associations. As a result, American Express and Discover are forced to operate as single-issuer networks, limiting their transaction and issuance volume and stunting their competitive vitality." 163 F.Supp.2d at 379.

71.    In *U.S. v. Visa/MasterCard*, the Court also found that the CPP has suppressed competition by foreclosing entry into debit cards. ACH based debit products possess a declining and tiny share of the debit card market as they are too costly and inefficient to viably compete with debit cards. As a result, to compete in the general purpose debit card market, a network must have direct access to the DDAs maintained by banks. By restricting access to the banks, virtually all of which are members of MasterCard and Visa, the CPP (and Visa By-Law 2.10(e))

24                                            35315.2

foreclosed Discover and American Express from participating in the general purpose debit card market.

72.     The foreclosure of competition caused by the CPP has harmed Paycom. As the Court noted in *U.S. v. Visa/MasterCard*, the CPP restrained Discover's output and transaction volume in the general purpose credit (or credit and T & E) market. The CPP also completely excluded Discover from the increasingly important general purpose debit market. Discover, as a result, has been unable to discipline MasterCard's continuing exercise of market power.

73.     In particular, Discover's implementation of a less onerous chargeback system compared to MasterCard has done nothing to restrain the facially anticompetitive chargeback regime employed by MasterCard. Discover, for example, issues retrieval requests before it issues chargebacks, giving Paycom the opportunity to challenge potential chargebacks or issue a merchant credit to avoid any chargeback fees. By contrast, under MasterCard's rules, chargebacks to CNP merchants are issued without first giving the merchant any opportunity to challenge them. For these and other reasons, Paycom's chargeback ratio for MasterCard transactions is approximately 13 times greater than it is for Discover transactions.

74.     In short, even though Discover's chargeback system is more favorable to merchants than MasterCard's regime, MasterCard's CPP has prevented Discover from achieving sufficient scale to challenge or restrain MasterCard's power over Internet merchants, or from otherwise acting as a competitive constraint on MasterCard's conduct.

25                                              35315.2

2.    MasterCard's Unlawful Chargeback System

75.    MasterCard's substantial market power in the market for credit card services to merchants, and in particular, to CNP merchants, has enabled MasterCard to impose on CNP merchants a facially anticompetitive chargeback system. Under this system, MasterCard and its member banks have agreed to withhold from CNP merchants a payment guarantee, which would have guaranteed them payment for accepting all authorized MasterCard transactions. As a result, MasterCard and its members have agreed to charge CNP merchants for all fraud. In implementing this scheme, MasterCard member banks have entered into a *per se* unlawful agreement not to compete regarding the costs of, and allocation of risk for, CNP chargebacks and fraud. MasterCard's agreement has resulted in higher prices and reduced output of CNP transactions because of the reduced incentives for MasterCard and its members to take substantial steps to combat CNP fraud.

a)    CNP Merchants Bear All of the Risk and Liability for Fraudulent Transactions.

76.    MasterCard and its members have enacted two very different sets of rules that govern the treatment of fraud and chargebacks in the MasterCard system. The first set of rules applies to brick-and-mortar merchants and is based on the payment "guarantee" that signature-authentication provides to merchants in the MasterCard system. The second set applies to CNP merchants who receive no payment guarantee from MasterCard.

77.    With brick-and-mortar merchants, MasterCard's chargeback system works as follows: When a customer makes a purchase with a MasterCard payment card, she signs a receipt which constitutes her agreement to pay the total amount of the purchase in accordance

26                                                           35315.2

with her cardholder agreement with the issuer. If the cardholder subsequently disputes the charge and submits the necessary paperwork to the issuing bank, the bank typically issues a chargeback to the acquirer. Upon the issuance of the chargeback, the total amount of the transaction (less the interchange fee) is debited from the acquiring bank and credited to the issuing bank. Within days, the acquirer debits the total amount of the transaction, including in many cases the discount fee, from the merchant's account. If the merchant cannot produce the signed receipt within a stipulated period of time, the issuer will keep the credited funds. If the merchant produces the signed sales receipt within a stipulated period of time, its acquiring bank will re-present the transaction for clearance, and in most cases, the re-presentment will be honored. When that occurs, payment for the goods and/or services will be restored to the merchant's account.

78.     The chargeback system in the brick-and-mortar world is based on the payment "guarantee" resulting from the cardholder's signature. As long as the merchant produces proof of a signed sales slip, it will almost always receive payment for the goods or services.

79.     With CNP merchants, MasterCard's chargeback system works as follows: When a consumer pays with a MasterCard payment card at a CNP merchant, she cannot sign a sales slip to authenticate that she is the person entitled to use the card. If the cardholder subsequently disputes the charge, even if she actually made the transaction, the issuer will chargeback the transaction and the total amount of the transaction will be debited from the acquiring bank (and ultimately the merchant's account) and credited to the issuing bank. Since the CNP merchant cannot produce a signed sales slip, it has virtually no ability to successfully re-present chargebacks, even when the CNP merchant receives a valid AVS and CVC 2 match (which, as

27                                          35315.2

discussed below, can be used as a far superior system of cardholder authentication than a signature) and MasterCard or its issuing member bank has authorized the transaction.

80.     As such, while MasterCard claims to provide all merchants "guaranteed payment," it has provided nothing of the sort to CNP merchants. Instead, it has agreed with its members to withhold a payment guarantee from CNP merchants and charge them the entire cost of fraud in CNP transactions. In doing so, MasterCard member banks have conspired not to compete with respect to the costs of, and allocation of risks for, CNP fraud and chargebacks.

81.     This unlawful agreement not to compete has no redeeming justification. As discussed more fully below, MasterCard could have provided CNP merchants with a payment guarantee based on a cardholder authentication system that would have been as secure, if not substantially more secure, than the signature-based system that has prevailed for decades in the brick-and-mortar world. Moreover, MasterCard's unlawful agreement cannot be justified by the risks CNP transactions purportedly impose on its system from any claimed higher incidence of fraud in the CNP world. These supposed risks are already accounted for in the higher interchange rates that CNP merchants (as compared to brick-and-mortar merchants) are forced to pay.

82.     This facially anti-competitive chargeback agreement has cost Paycom tens of millions of dollars in lost revenues from transactions that have been reversed because of chargebacks. It also has damaged Paycom and other CNP merchants by, in many cases, forcing them to pay the merchant discount on transactions that have been reversed through the chargeback system. As detailed above, when a transaction is initially consummated, the merchant receives the transaction amount less the merchant discount. But when a chargeback

occurs, MasterCard acquirers often take the entire transaction amount from the merchant's account. When that happens, CNP merchants pay fees for transactions for which they have received no benefit. The reason why MasterCard and its member banks can impose these requirements is their substantial market power over CNP merchants like Paycom and their willingness to abuse this power at every opportunity.

    b)  MasterCard Imposes Fixed Fines and Penalties on CNP Merchants.

  83.  MasterCard also has used its chargeback fine and penalty programs to fix certain prices that MasterCard and its acquirers impose on CNP merchants.

  84.  MasterCard's chargeback fine and penalty programs are based on arbitrary (and constantly changing) Chargeback Ratios and Chargeback Thresholds with which merchants must comply. The system has particularly harmed CNP merchants who, because of MasterCard's failure to provide a payment guarantee, have been subjected to the most severe chargeback fines and penalties. A subset of CNP merchants, including Paycom, have been exposed to the most onerous fines and penalties. MasterCard categorizes these merchants, many of which provide adult content, in a distinct merchant category code -- MCC 5967 -- to maximize the profits it extracts from them.

  85.  Under MasterCard's rules, if a merchant's Chargeback Ratio exceeds the applicable Chargeback Threshold, MasterCard can impose substantial fines on the merchant's acquiring bank. MasterCard has deliberately set the amount of these fines and penalties at levels which force acquirers to pass them along to merchants. As a result, these fines and penalties are almost always passed along to merchants. In effect, MasterCard has forced acquiring banks to agree to impose these fines and penalties on merchants. This price-fixing -- which puts an

29

effective floor on the price of these fines and penalties to merchants -- constitutes a *per se* violation of the antitrust laws.

86.    Over the past four years, MasterCard's chargeback penalties and fines have steadily increased. Beginning on or about December 1, 1999, MasterCard implemented a program for CNP merchants known as the "MCC 5967 Chargeback Compliance Program" (the "Original Program"). Under the Original Program, if Paycom and certain other CNP merchants experienced more than 100 chargebacks in a given month and their Chargeback Ratio exceeded 2.5% in that month, MasterCard would charge a fine of $50 per chargeback for each chargeback that exceeded the 2.5% Chargeback Threshold.

87.    MasterCard implemented a new program -- the Computer Network and Inbound Telemarketing Merchants Excessive Chargeback Program -- effective March 1, 2000 (the "March 2000 Program"). Under the March 2000 Program, if Paycom and certain other CNP merchants equalled or exceeded a 1% Chargeback Threshold in two consecutive months (the "Trigger Months") they could be classified, in MasterCard's sole discretion, as an "Excessive Chargeback Merchant." Merchants that received this classification were subject to "recovery fees" of $25,000 per month and $25 for all chargebacks incurred in months in which the 1% Chargeback Threshold was exceeded after the Trigger Months. If the merchant continued to exceed the 1% Chargeback Threshold, the monthly fine could increase from $50,000-$100,000, and the per chargeback "recovery fee" penalty to $50-$75 per chargeback. These fees could be imposed for each month the merchant exceeded the 1% Chargeback Threshold up to a full year or until MasterCard or the acquiring bank terminated the merchant.

30                                    35315.2

88.     In or about June 2002, MasterCard enacted the "Excessive Chargeback Program"

(the "New Chargeback Program"). Under the New Chargeback Program, MasterCard or its

acquiring member banks can declare a merchant an "Excessive Chargeback Merchant" if the

merchant experiences more than 15 chargebacks and exceeds the 1% Chargeback Threshold (for

chargeback transactions to total MasterCard transactions) or the 2.5% Threshold (for chargeback

dollar volume to total MasterCard dollar volume) in two Trigger Months.  MasterCard, once

again, maintains the discretion to classify a merchant as an "Excessive Chargeback Merchant."

Moreover, when a merchant has been declared an "Excessive Chargeback Merchant,"

MasterCard and its issuing member banks can collect fines and "recovery fees" for every

chargeback incurred for at least one full year, even if the merchant's Chargeback Ratio falls

below the Chargeback Thresholds at any month during the year.  MasterCard also reserves the

right to extend the one year period until it or the acquiring bank terminates the merchant.  The

fees under the New Chargeback Program escalate based on the following scale:

| TIME FRAME | FINES AND FEES |
|---|---|
| Trigger Months | None |
| First 3 months following the Trigger Months | $25 per chargeback plus $25,000 per month |
| Next 2 months (*ie.*, months 4-5 following the Trigger Months) | $50 per chargeback plus $50,000 per month |
| Next 2 months (*ie.*, months 6-7 following the Trigger Months) | $75 per chargeback plus $75,000 per month |
| All succeeding months (*ie.*, at least months 8-12 following the Trigger Months, and every month thereafter | $100 per chargeback plus $100,000 per month |

31                                        35315.2

89.     Even though Paycom has succeeded in bringing its Chargeback Ratio below 1%

(and thus well below reported CNP industry averages), MasterCard has fined it under the New

Chargeback Program.  While MasterCard did not announce the New Chargeback Program until

June 2002, it made it retroactively effective as of May 15, 2002, and applied it retroactively even

earlier than that.  And, since Paycom's Chargeback Ratio in May 2002 exceeded 1%, MasterCard

declared it an "Excessive Chargeback Merchant" and fined it for June-September 2002, even

though Paycom's Chargeback Ratios for those months were below 1%.

90.     Every aspect of MasterCard's fine and penalty programs appears to have been

designed to maximize the fines, penalties and fees MasterCard and its members extract from

merchants.  For example, all chargebacks -- including those that merchants manage to

successfully re-present -- are counted towards the merchant's Chargeback Ratio.  Thus, even

illegitimate chargebacks that are eventually reversed (eg. chargebacks that were mistakenly

initiated by issuers) are nonetheless applied towards the merchant's Chargeback Ratio.

91.     Even "automatic chargebacks" -- ie. chargebacks that MasterCard issuers initiate

for legitimate transactions that have not been disputed by cardholders -- are counted towards a

merchant's Chargeback Ratio.  MasterCard issuers initiate "automatic chargebacks" for

legitimate non-disputed transactions in various circumstances.  Based on information and belief,

some major MasterCard issuers have initiated chargebacks on certain CNP transactions for no

other reason than to maximize their revenues.  When a chargeback is issued for a CNP

transaction that was not challenged by the cardholder, the issuer may keep the full amount of the

transaction payment, even though the merchant provided a service for which the cardholder made

a willing payment.  Some MasterCard issuing member banks also chargeback all transactions for

a period of 6 to 12 months for CNP merchants that have been placed on the MATCH file -- the joint MasterCard/Visa file administered by MasterCard that is supposed to list merchants that have been terminated or that have violated MasterCard or Visa's regulations. Paycom suffered such automatic chargebacks when it and its principals were improperly listed on the MATCH file in 2001 by MasterCard acquirers who were retaliating against Paycom after it had stopped using their services.

92.    Based on information and belief, MasterCard is aware that its member banks issue "automatic chargebacks" and receive the benefit of a chargeback when the cardholder has not challenged the transaction. However, because these "automatic chargebacks" increase the supracompetitive fines, penalties and fees that MasterCard and its member banks receive from CNP merchants, MasterCard has done nothing to stop this practice.

93.    The severity of MasterCard's penalty and fine programs is further compounded by the fact that MasterCard, in its sole discretion, can classify merchant credits as chargebacks when it calculates a merchant's Chargeback Ratio. While issuing a merchant credit still requires Paycom to return the money it has been paid for the services it has provided, it gives Paycom the ability to avoid some of the exorbitant fines and penalties associated with MasterCard's chargeback regime. In this regard, Paycom maintains an extensive customer service center, where its representatives have been trained to immediately respond to calls and emails and issue merchant credits to any cardholder that requests a refund. However, MasterCard, at its whim, can count merchant credits as chargebacks in calculating Paycom's Chargeback Ratio to trigger the imposition of a penalty and/or fine.

35315.2

94.     To make matters worse, MasterCard counts all merchant credits as chargebacks
for purposes of its chargeback fine and penalty programs if the merchant's ratio of merchant
credits equals or exceeds its Chargeback Ratio. For example, if Paycom's Chargeback Ratio is
.3%, but it's merchant credit ratio is .7%, MasterCard will count the merchant credits as
chargebacks and impose a penalty and/or fine on Paycom. Under this scenario, MasterCard can
impose its punitive fines and penalties, even though Paycom's Chargeback Ratio is well below
the Chargeback Threshold.

95.     Moreover, in some cases, Paycom has suffered chargebacks on transactions for
which it has already issued a merchant credit to the consumer. Thus, Paycom is forced to refund
the transaction amount twice; once to the consumer through a merchant credit, and then to the
issuer because of the chargeback.

96.     All the participants in MasterCard's anticompetitive regime benefit from this
conduct. Over the damages period, Paycom has paid millions of dollars in chargeback fines,
penalties and fees to MasterCard and its member banks.

        c)     MasterCard and its Members Have Failed to Take Reasonable Measures to
            Provide a Payment Guarantee to CNP Merchants, or to Reduce CNP
            Fraud.

97.     By insulating MasterCard and its members from competition regarding CNP
fraud, and by providing a well-spring of supracompetitive interchange and chargeback revenue,
MasterCard's anticompetitive chargeback regime creates a system under which neither
MasterCard nor its members have any incentive to provide a real payment guarantee to CNP
merchants or to seriously reduce CNP fraud. On the contrary, MasterCard and its members have
acted on these perverse disincentives by actually encouraging fraud or, at best, by doing nothing.

35315.2

98.     One example of this perverse dynamic is MasterCard's failure to use existing

fraud protection technologies to provide CNP merchants a payment guarantee similar to that

provided to brick-and-mortar merchants. For example, MasterCard introduced AVS in the late

1980s and CVC 2 in the early to mid 1990s purportedly to reduce CNP fraud. The AVS system

compares a portion of the address and zip or post code provided by the purchaser with the

information the issuer maintains on file for the card the purchaser is attempting to use.  The

CVC 2 system requires that the purchaser provide a three-digit code that is printed on the back of

the card to verify that the consumer was using an actual card during the transaction.  When the

AVS and CVC 2 data provided matches the data the issuer maintains on file, in most cases, the

individual authorized to use the card is making the transaction.  Indeed, the authentication

afforded by these systems is far superior to the signature-based authentication that satisfies

MasterCard for brick-and-mortar transactions.  Yet MasterCard and its member banks have

refused to use these systems either alone or together to authenticate cardholders and provide an

effective payment guarantee to CNP merchants.

99.     With AVS, MasterCard offers CNP merchants no protection whatsover against

chargebacks.  With CVC 2, until recently, MasterCard also failed to offer CNP merchants any

protection from chargeback liability.  MasterCard recently revised its rules to protect merchants

against chargeback liability in the limited circumstance when a merchant checks for the CVC 2

code and the issuer does not support the service.  But MasterCard and its acquiring member

banks did not publicize this rule change to merchants, who have no other way to learn about

critical rules changes because they are prohibited from seeing the rules.  Further, under

MasterCard's revised rule, merchants still receive no protection from chargeback liability if the

issuer supports CVC 2, even if the merchant checks for the CVC 2 data and receives a positive CVC 2 match. Since virtually all issuers now support the CVC 2 service, the system provides CNP merchants with almost no protection against chargebacks.

100.    Consequently, CNP merchants receive chargebacks for fraud on tens of millions of transactions where they have received an authorization and passed along to issuers AVS and CVC 2 information that fully matched the data maintained by the issuer. In other words, even though the merchant can show that in all likelihood the consumer making the transaction was the person authorized to use the card, and MasterCard or the issuer authorized the transaction, the CNP merchant is still liable for any fraud.

101.    A more recent example of MasterCard's unwillingness to provide an effective payment guarantee to CNP merchants is SecureCode, MasterCard's latest purported attempt to address Internet fraud. With SecureCode, participating issuers sign up cardholders who are given a password that they can use at participating Internet merchant locations to authenticate that they are the person authorized to use the card. While SecureCode was not introduced in the United States until early 2003, MasterCard's Vice President for Business and Technology, Mark Patrick, recently conceded that the technology to provide this service has been available for several years.

102.    MasterCard could have implemented SecureCode (or something like it) in the late 1990s by requiring issuers to participate by a specific date and by shifting the chargeback liability to them if they failed to do so. It also could have encouraged merchants to participate by offering them reduced interchange rates. MasterCard justifies the higher interchange rates it forces CNP merchants to pay by arguing that they have higher fraud rates than brick-and-mortar merchants.

36                                                        35315.2

If that is true, offering CNP merchants reduced interchange rates to participate in SecureCode would have made business sense.

103.    But MasterCard never took these steps. Moreover, when it finally launched SecureCode, the product was designed and executed in a way that guaranteed its marginal (if not non-existent) impact on the market. Instead of shifting chargeback liability to issuers for MasterCard transactions made at participating merchants, SecureCode provides a payment guarantee only when the issuer and the cardholder are both participating and the merchant performs the SecureCode check. In addition, MasterCard has not compelled issuers to participate in SecureCode by a specified date. As a result, issuers who currently bear virtually no liability for fraud over the Internet have little or no incentive to participate. MasterCard's VP for Business and Technology Mark Patrick conceded this when he noted that MasterCard "already had the technology a few years ago but nobody adopted it because there was no liability shift, so issuing banks were not about to spend money to make themselves liable."

104.    MasterCard also has failed to give consumers incentives to sign up for SecureCode. MasterCard has done little to educate consumers about SecureCode or the value of making secure password-authenticated transactions over the Internet. MasterCard has instead pushed its "zero liability" policy. As a result, very few cardholders have signed up for the program. In fact, so few cardholders are participating that, in a recent press release about SecureCode, MasterCard declined to say how many consumers have signed up for the program. Since SecureCode's payment guarantee only transfers liability when both the issuer and the cardholder are participating in the program, the lack of issuer and cardholder participation has rendered the program worthless to merchants.

37                                                35315.2

105.    As such, even with SecureCode in the market, CNP merchants still bear virtually all risk of fraud. This inequitable system remains intact because it insulates MasterCard issuers and acquirers from competition regarding the costs of, and the allocation of risks for, CNP fraud, giving them the ability to impose fixed, supracompetitive and exorbitant fees upon CNP merchants. Instead of competing regarding their policies towards fraud and their treatment of "I didn't do it" fraud, MasterCard and its member banks have agreed to force CNP merchants to pay all CNP fraud costs by refusing to give CNP merchants any real payment guarantee. Moreover, to the extent that this agreement actually exacerbates fraud on the Internet, MasterCard and its member banks use that as a pretext to maintain continually increasing supracompetitive chargeback and interchange fees.

106.    MasterCard's failure to provide CNP merchants with a payment guarantee cannot be justified. While several options were available to MasterCard -- including AVS, CVC 2, and/or products like SecureCode (or Verified by Visa) -- no real payment guarantee has ever been implemented for CNP merchants, even though it would have benefited MasterCard and increased output. Using these systems to provide a payment guarantee would have dramatically reduced CNP fraud and increased the volume of CNP transactions as consumers would have had more confidence in their security.

107.    MasterCard and its member banks have failed to take even the most basic steps to reduce so-called "I didn't do it" fraud on the Internet. "I didn't do it" fraud occurs when cardholders claim they "didn't do it" even though they did make the purchase with the card they were authorized to use. This fraud accounts for the vast majority of Internet fraud. MasterCard's own publications admit that this type of fraud accounted for more than 80% of the chargeback

38                                                    35315.2

expenses associated with Internet transactions in the Fourth Quarter of 2000. MasterCard also admitted that "this poses a serious dilemma for merchants interested in tapping into today's business channels." Yet MasterCard and its member banks continue to deprive Internet and other CNP merchants of any recourse to combat such "I didn't do it" fraud.

108.    To make matters worse, MasterCard's "zero liability" policy actually encourages the "I didn't do it" fraud that is such a "dilemma" for Internet merchants and those wanting to become one. Under this policy, MasterCard and its issuing member banks inform cardholders that they will enjoy "the benefit of not being liable in the event of the unauthorized use of your U.S.-issued MasterCard." The policy tells cardholders that "[a]s a MasterCard cardholder, coverage extends to purchases made in a store, over the telephone, or on the Web." With respect to CNP transactions, this generous policy is virtually cost free to MasterCard and its member banks because merchants bear virtually all fraud costs in the MasterCard system through interchange and chargebacks. While cardholders (and consumers generally) are unaware of these costs, they ultimately bear them in the form of higher retail prices. Because "zero liability's" true costs to consumers are hidden, it indirectly encourages cardholders to dispute transactions, including legitimate transactions, as doing so appears to be cost-free to the consumer.

109.    Even though MasterCard and its members are in the best position to combat "I didn't do it" fraud, they avoid taking obvious and easy steps to address this phenomenon. For instance, issuers could simply block all transactions made with account numbers of cards for which chargebacks have been initiated. Such a course would be prudent since the card number might have been compromised by a hacker, and at the very least it would discourage "I didn't do it" fraud. But MasterCard issuers generally avoid doing that (and MasterCard does not require

39

them to reissue cards in these circumstances) to save the expense of having to reissue a new card every time a consumer claims she did not make a transaction. This failure to reissue new cards reflects the fact that MasterCard and its members know that many (if not most) of these transactions are "I didn't do it" fraud. Moreover, it shows that MasterCard and its members are willing to expose their cardholders to real fraud, because MasterCard and its members are insulated from its costs. And, to the extent that such practices actually increase CNP fraud, MasterCard and its members exploit that fraud to justify the supracompetitive interchange, chargeback fines, penalties and fees they impose on CNP merchants.

110.    The same perverse incentives have motivated MasterCard to avoid taking adequate steps to protect CNP merchants against real fraud. Stolen and compromised MasterCard card numbers are freely traded in certain countries (eg. Russia) as well as over certain Internet websites. Yet when specific examples of this fraud have been brought to MasterCard's attention, it has done nothing to block the use of these cards. For example, in February 2003 the successful "hacking" of a database of 13,000,000 payment cards at Data Processors International, Inc. ("DPI") was discovered. This data had been compromised for as much as one year prior to this discovery. Given the nature of the information that had been compromised, Internet and other CNP merchants had little or no ability to detect the fraudulent use of these numbers. Moreover, the nature of the compromised information exposed millions of MasterCard cardholders to the potentially severe personal and financial dislocation associated with identity theft.

111.    When the hacking of DPI's database was discovered, Paycom and other CNP merchants asked MasterCard to protect them and cardholders against potential fraud by listing

the compromised cards on a "hot card" file (which identifies known stolen cards) or by providing the merchants with the card numbers so that their fraudulent use could be detected. MasterCard refused to take these steps, even though these measures would have protected MasterCard cardholders from exposure to fraud.

112.   By failing to take measures to address this fraud, MasterCard abetted substantial fraud in its system -- to the detriment of MasterCard cardholders -- to increase the supracompetitive chargeback and interchange revenue MasterCard and its member banks earn from CNP merchants. To the extent MasterCard's failure to block these cards increased fraud, MasterCard and its members exploited that fraud to justify the supracompetitive interchange and chargeback fees CNP merchants are forced to pay.

   d)   MasterCard's Chargeback Scheme Has Forced Paycom to Incur
        Substantial Costs to Combat Fraud.

113.   MasterCard's failure to take reasonable measures to reduce CNP fraud or to provide the necessary incentives to its issuing members to take such measures, along with its punitive fine and penalty programs, has forced Paycom to step into the breach, at a substantial cost to the company and consumers.

114.   As detailed above, Paycom has deployed state-of-the-art fraud protection systems to minimize its exposure to fraud. These systems include the use of: (i) negative files of compromised card numbers against which transactions are checked; (ii) bank identification number ("BIN") tables to block certain BINs from countries or banks that have exhibited high chargeback rates; and (iii) velocity monitoring programs to detect unusual cardholder activity. Paycom blocks cards issued under roughly 1000 BINs which have a disproportionate amount of

41                                    35315.2

fraud associated with them. Paycom also blocks transactions from roughly 60 countries, which are especially prone to CNP fraud.

115.    Moreover, Paycom employs its own risk assessment guidelines to turn away transactions, which are otherwise authorized by MasterCard issuers, because they present too great a risk of chargebacks. For example, Paycom maintains a file of all cardholders who initiate chargebacks for any reason and blocks all subsequent activity with those cards, thus declining transactions from cards for which MasterCard and its issuing banks continue to provide authorizations.

116.    Paycom's fraud protection systems have drastically reduced the fraud that is successfully perpetrated on Paycom. As a result of these efforts, Paycom's Chargeback Ratio consistently has been below MasterCard's mandated 1% since June 2002 and well below the CNP industry's reported approximate 2.1% average.

117.    But Paycom's fraud protection efforts come at a substantial cost. Over 25% of Paycom's annual operating budget is spent on fraud protection. And about one-third of Paycom's staff is devoted either exclusively or substantially to fraud protection. Paycom would not have to devote such a high percentage of its resources to fraud protection if MasterCard and its members undertook reasonable efforts to combat CNP fraud.

118.    The aggressive and broad-based approach that Paycom has been forced to adopt to combat fraud has resulted in substantial lost business. Roughly 30% of the MasterCard transactions received by Paycom are blocked by Paycom's fraud screening systems, even though a high percentage of them likely are legitimate. Nevertheless, Paycom has been forced to employ

42                                                          35315.2

i

such overbroad fraud protection measures to avoid the punitive chargeback penalties imposed by MasterCard.

119.    Paycom's experience is consistent with the pattern seen by many other merchants in the CNP industry. According to a survey of Internet merchants by CyberSource Corp., for every fraudulent order that is processed, three are turned down by CNP merchants because they look suspicious. About two-thirds of the rejected transactions are actually likely legitimate orders that were turned down because they fit some negative parameters that caused them to be set aside. According to CyberSource, this lost business cost Internet merchants $2.1 billion in lost revenues in 2003.

        e)    MasterCard's Unlawful Chargeback Regime Raises Prices and Reduces Output.

120.    MasterCard's unlawful chargeback regime and the perverse incentives it creates harms consumers. Because they lack serious incentives to reduce CNP fraud, and profit handsomely from such fraud, MasterCard and its members maintain practices that exacerbate such fraud. This harms cardholders who are forced to deal with the financial and personal dislocation caused by payment card fraud, including identity theft. Moreover, all consumers are forced to pay higher prices as merchants typically pass along, in whole or in part, the supracompetitive interchange and chargeback fees MasterCard's unlawful conduct forces them to pay.

121.    These practices also have reduced transaction volumes. By failing to take obvious measures to reduce CNP fraud, MasterCard and its issuers have forced CNP merchants to take excessively aggressive and inefficient measures to combat fraud. As described above, these

35315.2

measures inevitably involve the rejection of billions of dollars of potentially legitimate transactions. This output would not have been lost had MasterCard and its issuers taken basic steps to control fraud.

122.    The failure by MasterCard and its members to take reasonable measures to reduce fraud also has undermined consumer confidence in the security of MasterCard transactions over the Internet. Numerous studies show that, years after the Internet flourished as a medium for consumer-to-business transactions, many consumers remain unwilling to shop online because of security concerns. Yet MasterCard and its members have persisted in their scheme to deprive CNP merchants of a payment guarantee, and in their refusal to take other measures to reduce CNP fraud, so they can reap supracompetitive interchange and chargeback revenues from CNP merchants.

3.    MasterCard's "Cross-Border Acquiring Rules"

123.    Unlike most brick-and-mortar merchants who need to deal with a U.S.-based acquirer that can physically process transactions at the point-of-sale, Internet merchants could contract with any of the numerous banks that provide MasterCard merchant acquiring services outside the United States. Non-U.S. acquirers can provide acquiring services to Internet merchants just as efficiently as acquirers operating within this country. Internet merchants should enjoy the benefits of a highly competitive payment card processing services market where they could choose from a wide array of potential acquirers. Instead, because of MasterCard's cross-border acquiring rules, and the onerous capital and operational requirements MasterCard imposes on acquirers handling Internet merchant accounts, like Paycom, many Internet merchants face a market limited to very few acquiring options.

**44**

124.     MasterCard's "cross-border acquiring rules" which have been in force throughout
the damages period, prevent non-U.S. banks from competing in the United States for the
provision of acquiring services to Internet merchants. While MasterCard planned to eliminate
these rules effective January 1, 2001, it rescinded the proposed change and the rules remain in
force.

125.     By enacting and enforcing these rules, MasterCard has implemented a market
allocation scheme that has insulated U.S. banks that provide acquiring services to Internet
merchants from competing against such acquirers located outside the U.S. This market
allocation scheme is anticompetitive on its face. It has prevented numerous foreign acquirers
from providing acquiring services to U.S.-based Internet merchants. It has raised prices and
reduced output in the market. Moreover, it has supplemented and reinforced the anticompetitive
market structure, in which MasterCard has been able to implement many of the abusive practices
detailed in this Complaint.

4.     MasterCard's Internet Merchant Qualification Mandates

126.     MasterCard recently revised its rules to make it impossible for Paycom to do
business under its current business model. These revised rules have no commercial justification.
Rather, they are nothing more than a disguised attempt by MasterCard and its acquiring members
to force merchants like Paycom to cede their clients to MasterCard acquiring members. In so
doing, MasterCard can increase the supracompetitive chargeback fees it extracts from these
merchants. These rules also are designed to entrench MasterCard's market power by, among
other things, preventing merchants like Paycom from achieving sufficient scale on the Internet

45                                                           35315.2

such that they could provide a platform to launch a brand and/or form of payment that could compete directly against MasterCard.

127.    As detailed above, Paycom is a merchant that sells access to password protected websites that its customers offer to consumers over the Internet. Initially, neither Visa nor MasterCard were familiar with Paycom's business model, and both Associations struggled to define it. Visa ultimately classified Paycom, and companies like it, as "Internet Payment Service Providers" ("IPSPs"). This definition reflects the added value Paycom gives Internet merchants by providing cardholder services and by using technologically advanced systems to process payments and reduce fraud. Visa classifies IPSPs under a distinct merchant category code.

128.    In creating the definition of an IPSP, Visa implemented a system to manage and reduce the risks that may be inherent in this business model. Visa requires IPSPs to identify and register their website customers with Visa. Visa also requires IPSPs to report the activity of their website customers on a monthly basis. This system allows Visa to track whether an IPSP's website customers are the source of an inordinate amount of fraud.

129.    MasterCard recently has undertaken an entirely different, unnecessary and anticompetitive way to deal with companies like Paycom. While MasterCard's rules classify certain merchants as "Payment Service Providers," MasterCard did not adopt that classification or Visa's IPSP designation for merchants such as Paycom. Instead, MasterCard treated Paycom as a regular merchant in its system. After doing that for years, MasterCard reinterpreted its regulations in the summer of 2002 to re-classify Paycom as an "aggregator," a merchant that simply collects other merchants' transactions and deposits them into a single account. Since MasterCard's rules prohibit "aggregators," MasterCard is now demanding that Paycom change

46                                                                35315.2

its business model to force it to qualify as a "Member Service Provider" ("MSP") to continue to accept MasterCard transactions. Under MasterCard rules, an MSP does not deal with consumers. Rather, MSPs introduce merchants to MasterCard acquiring banks who then open a merchant account for the merchant. In short, after years of treating Paycom as a regular merchant in its system, MasterCard is attempting to compel Paycom to deliver its merchant customers to a MasterCard acquiring member bank.

130.    Paycom cannot comply with MasterCard's MSP rules without substantially changing, and devastating, its business model. As detailed above, Paycom deals directly and extensively with consumers. That is exactly what their web customers pay them to do. To qualify as an MSP, Paycom would have to abandon the very essence of its business.

131.    Under MasterCard's reinterpreted rules, Paycom can avoid being treated as an MSP if it changes its business model to avoid being classified as an aggregator. Under these changes Paycom would have to: (i) prohibit its merchant customers from displaying the price of the goods and services they are providing on their own websites so that such information will be listed only on Paycom's website; and (ii) enable consumers to purchase goods and services from multiple client websites in a single transaction on Paycom's website (the so-called "shopping cart experience"). These changes would confuse consumers who would not know the prices charged by individual websites until they leave the site and click on Paycom's site. Moreover, they would put Paycom in violation of Visa's regulations, which require Paycom's website customers to display all purchase terms, including price terms. In short, MasterCard has put a Hobson's Choice before Paycom: either it can become an MSP and cede its customers to a MasterCard acquiring bank or it can destroy its business model to provide a "shopping cart experience."

47                                35315.2

132.    MasterCard is now threatening to impose fines of $2,500 per day retroactive to May 1, 2003, totaling approximately $400,000, if Paycom does not comply. Paycom's acquiring bank is currently withholding payments owed to Paycom to cover these threatened fines. MasterCard also is threatening to terminate Paycom's ability to accept MasterCard transactions if Paycom does not: (i) restructure its business to avoid being classified as an "aggregator" or (ii) become an MSP under MasterCard's rules.

133.    MasterCard's abrupt decision to reinterpret its rules cannot be justified. Paycom is not an "aggregator" as it provides value-added services to its customers. Paycom cannot be an MSP as it deals with consumers. Moreover, MasterCard's pretextual rules changes cannot be justified as a measure to monitor and reduce the risks in its system. To the extent special rules are needed to monitor the risks Paycom's website customers may pose to the system, Visa's IPSP system is a more effective model. MasterCard's proposed "shopping cart" model, if anything, will increase cardholder confusion and dissatisfaction as consumers would not know the price of the services they were potentially interested in purchasing until they leave a customer's website. This confusion likely will lead to more chargebacks, which will give MasterCard and its members the ability to extract more fines, penalties and fees from CNP merchants.

134.    Given the patent lack of commercial justification for these rules changes, and the obvious problems they will create, MasterCard's apparent purpose is to drive merchants like Paycom out of business or turn them into MSPs in the MasterCard system. Either result would lessen competition in the market for payment card processing services to Internet merchants and benefit MasterCard's acquiring member banks in that market.

48                                          35315.2

135.    This result also would enhance MasterCard's ability to increase the

anticompetitive fees it earns from Internet merchants. Numerous small merchants will be forced

to pay a $1,000 registration fee to MasterCard when they open up their own merchant accounts

with a MasterCard acquiring bank. In addition, all of these individual merchants, rather than a

single IPSP merchant like Paycom, will be exposed to MasterCard's unlawful chargeback regime

substantially increasing the volume of chargeback fees MasterCard and its members receive.

And it will be more difficult for these small merchants to qualify for volume-based interchange

fee reductions, maximizing MasterCard and its member banks' interchange revenues from these

merchants.

136.    These rules also will reinforce MasterCard's power in the general purpose credit

(and/or credit and T & E) market by removing the threat IPSP merchants potentially pose as

platforms for alternative forms of payment and/or brands that would directly compete against

MasterCard.

### E.    Antitrust Injury

137.    MasterCard's exclusionary conduct has harmed competition. As detailed above,

the CPP has adversely affected competition in the general purpose credit (or credit and T & E)

market and the general purpose debit card market. This foreclosure of competition has harmed

Paycom. The CPP restrained Discover's output and transaction volume in the general purpose

credit (or credit and T & E) market, and it completely excluded Discover from the general

purpose debit market. Discover, as a result, has been unable to discipline MasterCard's

continuing exercise of market power against CNP merchants such as Paycom. This is apparent

49                                                    35315.2

from the fact that, notwithstanding Discover's less onerous chargeback policies, MasterCard has exacerbated the punitive effects of its chargeback policies and rules in the past few years.

138.    MasterCard has implemented a facially anticompetitive chargeback agreement. Under this scheme, MasterCard and its members have agreed not to provide a payment guarantee to CNP merchants. Instead, they have agreed to charge CNP merchants all costs of fraud for CNP transactions. This scheme insulates MasterCard member banks from competition regarding the costs of, and allocation of risk for, CNP fraud and chargebacks. Moreover, this unlawful agreement has created perverse incentives that have exacerbated fraud, raised prices and reduced output. Paycom has lost tens of millions of dollars in revenues as a direct consequence of this unlawful agreement.

139.    MasterCard's chargeback fine and penalty programs are another component of this unlawful agreement. MasterCard has deliberately set the amount of these fines at levels that vastly exceed the cost of chargebacks and which are well beyond acquirers' capacity to absorb. MasterCard understands that acquirers virtually always pass these fines along to merchants, as a result. This practice is anticompetitive on its face; it sets a floor on pricing to merchants for chargeback fines and penalties. Paycom has paid millions in dollars in supracompetitive and unlawful fines and penalties as a result.

140.    MasterCard has supplemented the pernicious effects of its chargeback regime by implementing a *per se* unlawful market allocation scheme that further limits the competitive choices available to Internet merchants, such as Paycom. Under MasterCard cross-border acquiring rules, non-U.S. banks are prohibited from competing in the U.S. to provide acquiring services to merchants. Accordingly, firms like Paycom have severely limited options in choosing

50                                    35315.2

acquiring banks and must accept MasterCard acquiring service contracts on unfavorable terms.
This scheme has harmed competition in the markets for payment card processing services to
merchants and/or Internet merchants.

141.   MasterCard's Internet Merchant Qualification Mandates threaten to force Paycom
out of business if it does not abandon its current, and highly successful, business model.  These
rules are nothing more than a pretext by MasterCard to force Paycom to cede its website
customers to MasterCard acquiring banks who directly compete with Paycom.  Moreover, they
are designed to reinforce MasterCard's market power over these merchants, and increase the
supracompetitive interchange and chargeback revenues that MasterCard and its members force
upon them.  This group boycott has harmed competition in the markets for payment card
processing services to merchants and/or Internet merchants.

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### SHERMAN ACT SECTION 2-MONOPOLIZATION
### GENERAL PURPOSE CREDIT CARD MARKET

142.   Paycom repeats and realleges each and every allegation contained in paragraphs 1
through 141 with the same force and effect as if here set forth in full.

143.   Throughout the damages period, MasterCard has had power over price and the
power to exclude competition in the general purpose credit card market.  MasterCard has
maintained this power both individually and collectively with Visa.

144.   In *United States v. Visa/MasterCard*, the Court held that MasterCard, individually
and collectively with Visa, had substantial market power over merchants, including CNP
merchants.

51                                          35315.2

145.   MasterCard willfully maintained that monopoly power in the general purpose credit card market through overt exclusionary acts, such as the CPP and the Internet Merchant Qualification Mandates, which have restrained and impeded the growth of its existing or potential competitors. This conduct has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

146.   Paycom has suffered antitrust injury from MasterCard's willful monopolization of the general purpose credit market.

147.   As a result of MasterCard's unlawful monopolization of the general purpose credit card market, Paycom has been injured in its business and property in an amount not presently known with precision but which is, at a minimum, tens of millions of dollars, prior to trebling.

148.   Such violation and the effects thereof are continuing and will continue unless the injunctive relief is granted. Paycom has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
## SHERMAN ACT SECTION 2-MONOPOLIZATION
## GENERAL PURPOSE CREDIT CARD AND T & E CARD MARKET

149.   Paycom repeats and realleges each and every allegation contained in paragraphs 1 through 148 with the same force and effect as if here set forth in full.

150.   Throughout the damages period, MasterCard has had power over price and the power to exclude competition in the general purpose credit and T & E card market. In *U.S. v. Visa/MasterCard*, the Court held that MasterCard, individually and collectively with Visa, had substantial market power over merchants, including CNP merchants.

151.   MasterCard willfully maintained that monopoly power through overt exclusionary acts, such as the CPP and the Internet Merchant Qualification Mandates, which have restrained

35315.2

and impeded the growth of its existing and potential competitors. This conduct has violated

Section 2 of the Sherman Act, 15 U.S.C. § 2.

152.    Paycom has suffered antitrust injury from MasterCard's willful monopolization of

the general purpose credit and T & E market.

153.    As a result of MasterCard's unlawful monopolization, Paycom has been injured in

its business and property in an amount not presently known with precision but which is, at a

minimum, tens of millions of dollars, prior to trebling.

154.    Such violation and the effects thereof are continuing and will continue unless the

injunctive relief is granted. Paycom has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
## SHERMAN ACT SECTION 1
## CONTRACT, COMBINATION, CONSPIRACY AND AGREEMENT IN RESTRAINT
## OF TRADE

155.    Paycom repeats and realleges each and every allegation contained in paragraphs 1

through 154 with the same force and effect as if here set forth in full.

156.    In *U.S. v. Visa/MasterCard*, the Court held that MasterCard, individually and

collectively with Visa, had substantial market power over merchants, including CNP merchants.

The Court also held that MasterCard's CPP unreasonably restrained trade in the general purpose

credit and T & E market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

157.    Paycom has suffered antitrust injury from this unreasonable restraint of trade.

158.    As a result of this violation of Section 1 of the Sherman Act, Paycom has been

injured in its business and property in an amount not presently known with precision but which

is, at a minimum, tens of millions of dollars, prior to trebling.

35315.2

159.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief is granted. Paycom has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
## SHERMAN ACT SECTION 1
## CONTRACT, COMBINATION, CONSPIRACY AND
## AGREEMENT IN RESTRAINT OF TRADE

160.    Paycom repeats and realleges each and every allegation contained in paragraphs 1 through 159 with the same force and effect as if here set forth in full.

161.    In *U.S. v. VisaMasterCard*, the Court held that MasterCard, individually and collectively with Visa, had substantial market power over merchants, including CNP merchants. The Court also held that MasterCard's CPP unreasonably restrained competition by foreclosing rival networks entry into debit cards in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

162.    This unreasonable restraint of trade injured competition in the general purpose debit market.

163.    Paycom has suffered antitrust injury from this unreasonable restraint of trade.

164.    As a result of this violation of Section 1 of the Sherman Act, Paycom has been injured in its business and property in an amount not presently known with precision but which is, at a minimum, tens of millions of dollars, prior to trebling.

165.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief is granted. Paycom has no adequate remedy at law.

54                                          35315.2

## FIFTH CLAIM FOR RELIEF
## SHERMAN ACT SECTION 1
## CONTRACT, COMBINATION, CONSPIRACY AND
## AGREEMENT IN RESTRAINT OF TRADE
## PER SE UNLAWFUL AND UNREASONABLE (RULE OF REASON)
## AGREEMENT NOT TO COMPETE

166.    Paycom repeats and realleges each and every allegation contained in paragraphs 1 through165 with the same force and effect as if here set forth in full.

167.    Throughout the damages period, MasterCard and its co-conspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

168.    This contract, combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among MasterCard and its member banks to not provide a payment guarantee to CNP merchants and to not otherwise compete regarding the costs of, and allocation of risk for, CNP fraud and chargebacks.

169.    Paycom has suffered antitrust injury from this contract, combination and conspiracy in unreasonable restraint of trade.

170.    As a result of this *per se* unlawful agreement not to compete, Paycom has been injured in its business and property in an amount not presently known with precision but which is, at a minimum, tens of millions of dollars, prior to trebling.

171.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief is granted. Paycom has no adequate remedy at law.

55                                                            35315.2

### SIXTH CLAIM FOR RELIEF
### SHERMAN ACT SECTION 1
### CONTRACT, COMBINATION, CONSPIRACY AND
### AGREEMENT IN RESTRAINT OF TRADE
### PER SE UNLAWFUL AND UNREASONABLE (RULE OF REASON) PRICE-FIXING

172.     Paycom repeats and realleges each and every allegation contained in paragraphs 1

through 171 with the same force and effect as if here set forth in full.

173.     Throughout the damages period, MasterCard and its co-conspirators have

continually engaged in an unlawful contract, combination, conspiracy and agreement in restraint

of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

174.     This contract, combination and conspiracy has consisted of a continuing

agreement, understanding and concert of action among MasterCard and its member banks to fix

the fines and penalties that CNP merchants are forced to pay under MasterCard's unlawful

chargeback regime.

175.     Paycom has suffered antitrust injury from this contract, combination and

conspiracy in unreasonable restraint of trade.

176.     As a result of this unlawful agreement, Paycom has been injured in its business

and property in an amount not presently known with precision but which is, at a minimum, tens

of millions of dollars, prior to trebling.

177.     Such violation and the effects thereof are continuing and will continue unless the

injunctive relief is granted.  Paycom has no adequate remedy at law.

35315.2

## SEVENTH CLAIM FOR RELIEF
## SHERMAN ACT SECTION 1
## CONTRACT, COMBINATION, CONSPIRACY
## AND AGREEMENT IN RESTRAINT OF TRADE
## PER SE UNLAWFUL MARKET ALLOCATION SCHEME

178.    Paycom repeats and realleges each and every allegation contained in paragraphs 1
through 177 with the same force and effect as if here set forth in full.

179.    Throughout the damages period, MasterCard and its co-conspirators have
continually engaged in an unlawful contract, combination, conspiracy and agreement in restraint
of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

180.    This contract, combination and conspiracy has consisted of a continuing
agreement, understanding and concert of action among MasterCard and its member banks to
allocate the market in which MasterCard acquirers provide processing services to merchants
and/or to Internet merchants.

181.    This agreement restrained competition in the market for payment processing
services to merchants and/or the market for payment processing services to Internet merchants by
preventing merchants and Internet merchants like Paycom from contracting with non-U.S.
acquirers.

182.    Paycom has suffered antitrust injury from this contract, combination and
conspiracy in unreasonable restraint of trade.

183.    As a result of this *per se* unlawful market allocation scheme, Paycom has been
injured in its business and property in an amount not presently known with precision.

184.    Such violation and the effects thereof are continuing and will continue unless the
injunctive relief is granted.  Paycom has no adequate remedy at law.

35315.2

### EIGHTH CLAIM FOR RELIEF
### SHERMAN ACT SECTION 1
### CONTRACT, COMBINATION, CONSPIRACY
### AND AGREEMENT IN RESTRAINT OF TRADE
### PER SE UNLAWFUL AND UNREASONABLE
### (RULE OF REASON) GROUP BOYCOTT

185.    Paycom repeats and realleges each and every allegation contained in paragraphs 1 through 184 with the same force and effect as if here set forth in full.

186.    MasterCard and its co-conspirators have entered into in an unlawful contract, combination, conspiracy and agreement in restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This contract, combination and conspiracy is based on a continuing agreement, understanding and concert of action among MasterCard and its member banks to implement Internet Merchant Qualification Mandates that will effectively prevent Paycom from competing in the market for payment processing services to merchants or Internet merchants. These rules also will prevent IPSPs from emerging as potential platforms for alternative payment products or brands that could compete directly against MasterCard.

187.    MasterCard and its member banks have substantial market power over Paycom. This group boycott will prevent Paycom from accepting MasterCard transactions, thereby denying it an input that is essential to effective competition.

188.    This conduct is harming the market for payment processing services to merchants and/or the market for payment processing services to Internet merchants. Paycom will suffer antitrust injury from this contract, combination and conspiracy in unreasonable restraint of trade.

189.    As a result of this unlawful agreement, Paycom has been injured in its business and property in an amount not presently known with precision.

35315.2

190.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief is granted.  Paycom has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Paycom respectfully demands:

A.    That the Court declare, adjudge and decree that MasterCard has committed the violations of federal law alleged herein;

B.    That MasterCard, its directors, officers, employees, agents, successors and members be enjoined and restrained from, in any manner, continuing to impose the refusal to compete, price-fixing, market allocation and group boycott agreements, which are detailed in this Complaint.

C.    That the Court award damages sustained by Paycom in an amount to be proved at trial, to be trebled according to antitrust law, plus interest, including prejudgment interest, attorneys' fees and costs of suit, and such other and further relief as this Court may deem just and proper.

35315.2

## **JURY DEMAND**

Paycom hereby demands trial by jury of all issues properly triable thereby.

Dated: New York, New York
December 5, 2003

Respectfully submitted,
**CONSTANTINE & PARTNERS, P.C.**

By:

Jeffrey I. Shinder (JS-5719)
Gordon Schnell (GS-2567)
Lloyd Constantine (LC-8465)
Reiko Cyr (RC-4323)
477 Madison Avenue, 11th Fl.
New York, New York 10022
(212) 350-2700
Attorneys for Paycom Billing Services, Inc.

35315.2