## TABLE OF CONTENTS

**Page #**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Paycom's Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    MasterCard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.    MasterCard's Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            2.    A Typical MasterCard Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            3.    The Reversal of a Typical Transaction - Chargebacks . . . . . . . . . . . . . . . 7
            4.    MasterCard's Market Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.    MasterCard's Anticompetitive Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            1.    The CPP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            2.    MasterCard's Chargeback Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            3.    MasterCard's Cross-Border Acquiring Rules . . . . . . . . . . . . . . . . . . . . 10
            4.    MasterCard's IMQ Mandates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    Applicable Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.    MasterCard's Motion to Dismiss Should Be Denied . . . . . . . . . . . . . . . . . . . . 11

            1.    Paycom Has Alleged Facts Sufficient to Support its Section 1 Claims . . . . . 12

                  (a)    The Sufficiency of Paycom's CPP Claim . . . . . . . . . . . . . . . . . . . . 12
                  (b)    The Sufficiency of Paycom's Chargeback Claims . . . . . . . . . . . . . . 15
                  (c)    The Sufficiency of Paycom's Cross-Border Acquiring Claim . . . . . . 18
                  (d)    The Sufficiency of Paycom's IMQ Mandates Claim . . . . . . . . . . . 21

            2.    Paycom Has Alleged Facts Sufficient to Support its Monopolization Claims . 23

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page #**

*AD/SAT v. Associated Press*, 181 F.3d 216 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Barton & Pittinos, Inc., v. Smithkline Beecham Corp.*,
 118 F.3d 178 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22

*Bennet v. Cardinal Health Marmac Distribs., Inc.*,
 No. 02 CV 3095, 2003 WL 21738604 (E.D.N.Y. July 14, 2003) . . . . . . . . . . . . . . . . . . 14

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
 152 F.3d 588 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
 441 U.S. 1 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Broadway Delivery Corp. v. United Parcel Serv.*,
 651 F.2d 122 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

*Charles W. v. Maul*, 214 F.3d 350 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Copperweld Corp. v. Independence Tube Corp.*,
 467 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dr. Miles Med. Co. v. John D. Park & Sons Co.*,
 220 U.S. 373 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Engine Specialties, Inc. v. Bombardier Ltd.*,
 605 F.2d 1 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 477 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Falstaff Brewing v. Stroh Brewing Co.*,
    628 F. Supp. 822 (N.D. Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Flash Electronics, Inc. v. Universal Music & Video Distrib. Corp.*,
    -- F. Supp. 2d —, 2004 WL 764584 (E.D.N.Y. Mar. 31, 2004) . . . . . . . . . . . . . . . . 19, 20

*G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 14

*Gregory Mtkg. Corp. v. Wakefern Food Corp.*,
    787 F.2d 92 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hosp. Bldg. Co. v. Trs. of the Rex Hosp.*,
    425 U.S. 738 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238,
    2003 WL 1712568, at *6 (E.D.N.Y. Apr. 1, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Int'l Distrib. Ctrs. Inc. v. Walsh Trucking Co.*,
    812 F.2d 786 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
    61 F. 3d 123 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.*,
    246 F.3d 752 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Nat'l Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents*,
    468 U.S. 85 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Northern Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Poller v. Columbia Broad.*, 368 U.S. 464 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Reazin v. Blue Cross and Blue Shield of Kan., Inc.*,
    899 F.2d 951 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992
    (N.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Salahuddin v. Cuomo,* 861 F. 2d 40 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*SCFC ILC, Inc. v. Visa U.S.A., Inc.*, 36 F.3d 958
    (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951) . . . . . . . . . . . . . . . . . . . . 18, 19

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 25

*U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d
    322 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 13, 17, 18, 23, 24

*Zinermon v. Burch*, 494 U.S. 113 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## Other Authorities

7 P. Areeda, ¶ 1511 *Antitrust Law*, at 429 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Robert H. Bork, *The Antitrust Paradox* 107-15 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Jeffrey I. Shinder (JS-5719)
Gordon Schnell (GS-2567)
Lloyd Constantine (LC-8465)
Reiko Cyr (RC-4323)
Jean Kim (JK-8235)
**CONSTANTINE & PARTNERS**
477 Madison Avenue
New York, New York 10022
(212) 350-2700
(212) 350-2701

Attorneys for Plaintiff
**PAYCOM BILLING SERVICES, INC.**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

_____

**PAYCOM BILLING SERVICES, INC.,**          **Case No. CV 03 6150 (DGT)(RLM)**

                    Plaintiff,
          vs.

**MASTERCARD INTERNATIONAL, INC.,**

                    Defendant.
_____

## PAYCOM'S  MEMORANDUM OF LAW IN OPPOSITION TO MASTERCARD'S MOTION TO DISMISS THE COMPLAINT

Plaintiff Paycom Billing Services, Inc. respectfully submits this memorandum of law in opposition to MasterCard International Incorporated's motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Paycom's Complaint.[1]

## I. PRELIMINARY STATEMENT

MasterCard's motion is constructed on two falsehoods: (i) that Paycom alleges only injury to itself and not to competition; and (ii) that Paycom has not alleged antitrust standing and antitrust injury because it is neither a consumer nor a competitor in the relevant markets.  To credit these arguments, one needs to ignore virtually every paragraph of the Complaint.

The Complaint details a wide ranging scheme by MasterCard to entrench and exploit its substantial market power over card-not-present ("CNP") merchants.[2]  This scheme includes the following MasterCard rules, regulations and policies: (i) the Competitive Programs Policy ("CPP"); (ii) the chargeback regime for CNP merchants; (iii) the cross-border acquiring rules; and (iv) the Internet Merchant Qualification ("IMQ") Mandates.  With each claim, the Complaint provides elaborate details regarding injury to competition and how Paycom's injuries flow directly from the suppression of competition these rules engender.

The Complaint describes how the CPP has harmed competition by preventing MasterCard member banks -- which include virtually every major bank in the United States -- from issuing American Express and Discover cards.  (Compl. ¶¶ 70 - 77.)  And the Complaint details how this

---

[1]     References to the "Complaint" or "Compl." refer to Paycom's Complaint and Jury Demand, dated December 5, 2003.  References to "MC Mem." refer to MasterCard's memorandum of law in support of its motion to dismiss.

[2]     CNP merchants are merchants, such as Internet or mail-order/telephone-order merchants, which sell goods and/or services to consumers without face-to-face interaction.  (Compl. ¶ 2.)

1

foreclosure harmed Paycom as a merchant-purchaser of MasterCard payment card services.  (Compl.

¶¶ 72-74.)  This very harm and foreclosure was recognized by the court that recently invalidated the

CPP for violating the antitrust laws:

> Not only issuers and card associations but also merchants would benefit from an
> increase in competition among general purpose card networks, because merchants, as
> well as issuers, are consumers of network services . . . .  Moreover, enhanced
> competition from American Express and Discover would likely cause [MasterCard and
> Visa] to be more responsive to the interests of merchants."

*United States v. Visa U.S.A., Inc*., 163 F. Supp. 2d 322, 396 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229
(2d Cir. 2003), *petition for cert. filed* (hereinafter "*U.S. v. Visa/MasterCard*").

Paycom's claims regarding MasterCard's chargeback regime are equally sound.  According to

the Complaint, through MasterCard's chargeback regime, MasterCard member banks have agreed not

to compete regarding the costs of, and allocation of risk for, CNP chargebacks and fraud.  (Compl. ¶

75.)  Such an agreement between horizontal competitors not to compete is plainly sufficient to survive

this motion.  As the Second Circuit recently held in affirming the invalidation of MasterCard's CPP,

agreements among the MasterCard membership not to compete "are exemplars of the type of

anticompetitive behavior prohibited by the Sherman Act."  *U.S. v. Visa/MasterCard*, 344 F.3d at

242.

The Complaint also clearly sets forth how this agreement not to compete has raised prices (*e.g.*,

supracompetitive interchange and chargeback fees and penalties), reduced output (*e.g.*, fewer

transactions), and lowered quality (*e.g.,* higher fraud) in the general purpose credit (or credit and T &

E) market.  (*See* Compl. ¶¶ 75, 82, 109-112, 118-121.)  These are the very types of competitive

injury "the antitrust laws were intended to prevent . . . ."  *Brunswick Corp. v. Pueblo Bowl-O-Mat,*

*Inc*., 429 U.S. 477, 489 (1977).

The Complaint also shows how the cross-border acquiring rules have raised prices and limited output by preventing foreign acquirers from entering the U.S. market. (Compl. ¶¶ 123-25.) Such market exclusion is another classic example of injury to competition. This market allocation scheme is a *per se* unlawful naked restraint of trade that is presumptively anticompetitive. (Compl. ¶ 125.)

Lastly, the Complaint explains how the IMQ Mandates threaten to deprive Paycom of MasterCard acceptance -- an input Paycom needs to survive -- if it does not cede its clients to a MasterCard acquirer. (Compl. ¶¶ 47, 129, 131.) Since Paycom competes with MasterCard acquirers in the market for payment card processing services to Internet merchants, this *per se* unlawful threatened group boycott will injure competition if it is carried out. (Compl. ¶ 134.)

To divert the Court from Paycom's detailed allegations of injury to competition, MasterCard principally relies on a single allegation in the Complaint -- that if Paycom were unable to accept MasterCard credit cards, consumers and its webmaster clients would immediately switch to Paycom's competitors. But this allegation is simply an example of MasterCard's substantial market power over Paycom. It has nothing to do with Paycom's allegations of injury to competition, which relate to the higher prices, lower output and reduced quality of payment card transactions that Paycom and all CNP merchants suffer because of MasterCard's anticompetitive conduct.

MasterCard also attempts to confuse Paycom's clear basis for antitrust injury and standing by arguing that Paycom is neither a consumer nor a competitor in the relevant markets. Yet, the Complaint clearly and repeatedly alleges that Paycom is actually both. It is a consumer with respect to its role as a direct merchant/purchaser of MasterCard payment card services. (Compl. ¶¶ 40, 45, 82, 89, 95-96,

3

113-19, 129.)  And it is a competitor with respect to its role as a provider of payment card processing services to Internet merchants.  (Compl. ¶¶ 47, 141.)

Finally, MasterCard tries to sidestep Paycom's Section 2 claims by arguing that Paycom has not alleged a MasterCard market share sufficient to show monopoly power.  But such a showing is not necessary when direct evidence of monopoly power is shown.  The Complaint details MasterCard's power over price and its ability to exclude competition.  (Compl. ¶¶ 55, 57, 63, 69, 70-71, 150.) These allegations of direct evidence of monopoly power are more than sufficient to state a Section 2 monopolization claim.

MasterCard's attempt to deride Paycom's claims as a disguised attempt to avoid the risks inherent in its business model blatantly distorts what this case is really about.  This case is about achieving unfettered competition in the market for credit (or credit and T & E card) service to merchants.  It is about achieving a MasterCard chargeback system disciplined by real network competition.  It is about requiring MasterCard members to compete regarding CNP chargebacks and fraud.  It is about giving merchants like Paycom greater choices regarding MasterCard acquiring services and the ability to negotiate competitive terms.  It is about giving Paycom the freedom to operate its business without the threat of being shut down if it continues to compete with MasterCard acquiring members.  In short, this case is about remedying a system in which MasterCard's abusive market practices have raised prices, lowered output and increased fraud in the payment card services provided to CNP merchants like Paycom, all of which redounds to the detriment of consumers.

## II.  BACKGROUND

### A.    Paycom's Business

Paycom is a merchant that sells access to websites that Paycom's customers offer to consumers over the Internet.  (Compl. ¶¶ 1, 40.)  Paycom enters into contracts with its website customers that authorize Paycom to make sales for their sites and accept MasterCard, Visa, and other forms of electronic payments for those sales.  (Compl. ¶ 40.)  To accept MasterCard transactions, Paycom contracts with a MasterCard acquiring member bank to set up a merchant account.  *Id.*  In doing so, Paycom is a direct purchaser of MasterCard credit and debit card services.  When a consumer makes purchases on Paycom's site with a MasterCard payment card, Paycom then submits the card transactions to its MasterCard acquiring member bank.  *Id.*  Paycom then passes along to its website customers the amount of the transactions (less Paycom's fees) that settle through the MasterCard system.  *Id*.

A substantial percentage of the website customers for which Paycom processes credit card transactions delivers digital content for the online "adult" industry.  (Compl. ¶ 42.)  Paycom does not produce, own or manage this content.  *Id.*  Rather, it sells access to the content in the form of recurring monthly memberships, account IDs and passwords that are given to consumers to enable them to view the content on the websites of Paycom's customers.  *Id.*  Paycom's website customers also include, among others, a municipal golf course, charities, insurance companies, publishing companies, Internet hosting companies, companies that sell downloadable software, and companies that provide other digital content such as sports forecasting and music.  *Id.*

MasterCard has traditionally treated Paycom as a merchant under its rules.  (Compl. ¶ 129.)  MasterCard, for example, has categorized Paycom under a distinct merchant category code.  (Compl. ¶ 84.)  Paycom pays the merchant discount (including the interchange fee) for all MasterCard

5

transactions it accepts.  (Compl. ¶40.)  Paycom also incurs the costs of MasterCard's onerous chargeback system.  Paycom pays the fines and fees that MasterCard and its members agree to impose on merchants.  (Compl. ¶¶ 82, 89, 95, 96, 113-19.)

In addition to being a merchant/purchaser of MasterCard services, Paycom competes directly with MasterCard acquiring member banks in providing payment processing services to Internet merchants.  (Compl. ¶ 47.)  These services include verifying the functionality of websites, and providing back-office risk management functions and customer service systems.  (Compl. ¶53.)

## B.   MasterCard

### 1.   MasterCard's Structure

MasterCard is an association comprised of thousands of financial institution member banks. (Compl. ¶ 63.)  MasterCard issuing members issue MasterCard payment cards to consumers for use at merchants that accept MasterCard forms of payment.  (Compl. ¶ 18.)  MasterCard acquiring members sign up the merchants that accept MasterCard transactions.  (Compl. ¶ 20.)  Virtually every major bank in the United States is a member of MasterCard.  (Compl. ¶ 63.)  Virtually all MasterCard member banks are also members of Visa.  *Id.*

To accept MasterCard transactions, Paycom and other merchants must contract with a MasterCard acquiring member bank to purchase MasterCard payment card services.  (Compl. ¶ 20.) The acquiring bank processes the credit card transactions that Paycom accepts and facilitates the flow of funds from the MasterCard issuing member bank to Paycom.  (Compl. ¶¶ 21, 24.)  Paycom, like all merchants that accept MasterCard transactions, must pay its acquiring bank a discount fee for each MasterCard transaction it accepts.  (Compl. ¶ 22.)  The acquiring bank in turn must pay the issuing

bank an interchange fee for each transaction at Paycom's site made with a MasterCard payment card issued by that bank. (Compl. ¶ 21.) The interchange fee is the principal component of the discount fee and is passed directly through from the acquirer to the merchant. *Id.* MasterCard and its member banks set the interchange fee. (Compl. ¶ 63.)

MasterCard and its member banks also set the rules that govern the acceptance of MasterCard cards, including the rules that dictate what happens when consumers chargeback (*i.e.*, dispute the validity of) a transaction. (Compl. ¶ 64.) Like interchange fees, these rules are passed directly through from the acquirer to the merchant. (Compl. ¶¶ 29, 58, 76-80.) MasterCard rules require acquiring banks to incorporate by reference MasterCard's operating regulations – which include the chargeback rules and other rule and policies challenged in the Complaint – into their contracts with merchants. (Compl. ¶ 58.)

### 2. *A Typical MasterCard Transaction*

When a consumer uses a MasterCard credit card to pay for a purchase, the payment transaction typically takes the following course:

> **Step 1** -- the consumer provides Paycom or other MasterCard merchants with information to verify that he has a valid MasterCard credit card and is authorized to use it (*e.g.,* name, address, card number, verification code); **Step 2** -- the merchant sends this information to its acquiring bank who sends it to the issuing bank who confirms that the consumer has a valid card, is authorized to use it, and has sufficient credit available to complete the transaction; **Step 3** -- the issuing bank sends an electronic message back to the acquirer, who then sends it to the merchant, either authorizing or declining the transaction; **Step 4** -- the merchant completes or rejects the transaction depending on whether it receives an authorization or decline from the issuer; **Step 5** -- the merchant sends completed transaction information to its acquirer who then sends this information to the issuer whose cardholder made the transaction; the issuer then sends the transaction amount (minus the interchange fees) to the acquirer who places the funds (minus its fees) into the merchant's account; **Step 6** -- the issuing bank bills the cardholder for the transaction amount. (Compl. ¶¶ 23, 24.)

### 3. The Reversal of a Typical Transaction - Chargebacks

If the cardholder disputes the validity of the charge, there is one additional step in the

transaction flow: **Step 7 --** the issuing bank issues what is called a chargeback which reverses the

transaction; the acquirer sends the transaction amount back to the issuer; then the acquirer takes those

funds back from the merchant.  (Compl. ¶ 29.)

MasterCard and its members have enacted two very different sets of rules that govern the

treatment of fraud and chargebacks in the MasterCard system.  (Compl. ¶ 76.)  The first set of rules

applies to "brick-and-mortar" merchants where the cardholder is typically physically present to

complete the purchase.  For such merchants, if a merchant can produce a signed sales receipt within a

stipulated period of time, the payment will be restored to its account.  (Compl. ¶ 77.)

The second set of MasterCard chargeback rules applies to CNP merchants.  (Compl. ¶¶ 76,

79.)  With CNP merchants, the customer cannot sign a sales receipt to authenticate that he/she is

entitled to use the card.  (Compl. ¶ 79.)  If the cardholder subsequently disputes the charge, even if

he/she actually made the purchase, the issuer will chargeback the transaction and the funds will be

removed from the merchant's account.  *Id.*  Since the CNP merchant cannot produce a signed sales

receipt, there is little, if anything that it can do to challenge the chargeback.  *Id.*

### 4. MasterCard's Market Power

MasterCard possesses substantial market power over merchants, and particularly CNP

merchants such as Paycom.  This power is reflected in the ability of MasterCard to continually raise the

price merchants pay for accepting MasterCard credit cards without losing any merchant customers.

(Compl. ¶ 55.)  It is further reflected in MasterCard's ability to price discriminate between classes of

merchants, with CNP merchants such as Paycom, paying among the highest fees for acceptance. (Compl. ¶ 57.)

MasterCard credit cards are the primary or only general purpose credit cards for tens of millions of consumers in the United States.  (Compl. ¶ 54.)  Since Paycom started doing business in 1997, it has needed to accept MasterCard credit card transactions to remain viable.  (Compl. ¶¶ 1, 47.)  As a result, MasterCard has substantial market power over Paycom.  (Compl. ¶ 1.)

**C.      MasterCard's Anticompetitive Conduct**

There are four MasterCard rules, regulations and policies that Paycom challenges in this case: (i) the CPP, (ii) the chargeback rules, (iii) the Cross-Border Acquiring Rules, and (iv) the IMQ Mandates.  All of these rules reinforce and exacerbate MasterCard's market power over Paycom and other CNP merchants, and have both individually and collectively injured Paycom and harmed competition.  (*See, e.g.*, Compl. ¶¶ 3-10, 68, 137-41.)

**1.      *The CPP***

Under the CPP, MasterCard's members are prohibited from issuing the cards of competing payment networks, other than Visa.  Visa has a virtually identical rule.  In *U.S. v. Visa/MasterCard,* the court found that these rules have suppressed competition from rival networks.  As a result, there are fewer payment options available as alternatives to MasterCard credit and debit cards for Paycom and other CNP merchants.  This foreclosure of competition has enhanced MasterCard's ability to charge higher prices to merchants and impose the anticompetitive practices described in the Complaint. (Compl. ¶¶ 69-74.)

**2.      *MasterCard's Chargeback Rules***

9

Under MasterCard's chargeback rules, Paycom and other CNP merchants must bear entirely the risk and costs associated with fraudulent transactions. This is true whether the fraud is real (as in the case with stolen cards) or fabricated (as in the case with cardholders denying transactions they actually made). This is true even if MasterCard or its members have authorized the transaction as a valid one. And, it is true regardless of the steps the CNP merchant takes to verify that the transaction is a valid and authorized one. In other words, MasterCard and its members, who are horizontal competitors, have agreed not to provide CNP merchants a payment guarantee. In doing so, they have conspired not to compete with respect to the costs of, and allocation of risks for, CNP fraud. They have also agreed to fix the price that merchants pay for this fraud through the chargeback fines and penalties set by MasterCard. (Compl. ¶¶ 75-122.)

Since MasterCard and its members bear virtually none of the risk or liability from CNP fraud -- and actually profit from it through their fixed supracompetitive interchange and chargeback revenue -- they have avoided taking basic steps to reduce it. They have avoided these steps despite the availability of fraud protection technologies that would have been cost-effective to implement and beneficial to consumers. This has forced Paycom and other CNP merchants to take excessively aggressive and inefficient measures to combat fraud including the blunderbuss rejection of billions of dollars of potentially legitimate transactions. (Compl. ¶¶ 97-122.)

### 3. MasterCard's Cross-Border Acquiring Rules

MasterCard's "cross-border acquiring rules" prohibits foreign banks from competing in the United States for the provision of acquiring services to merchants. (Compl. ¶ 124.) Foreign banks can provide acquiring services to U.S. Internet merchants just as efficiently as acquirers operating within this

country.  (Compl. ¶ 123.)  Without these rules, numerous foreign acquirers would have provided

acquiring services to U.S.-based Internet merchants.  (Compl. ¶ 125.)  These rules have severely

limited the number of acquiring banks with which Paycom and other United States based Internet

merchants can deal.  (Compl. ¶¶ 123, 140.)  As a result, prices have been raised and output reduced.

(Compl. ¶ 125.)  And merchants such as Paycom have been forced to accept acquirer contracts on

unfavorable terms.  (Compl. ¶ 140.)

### 4.    *MasterCard's IMQ Mandates*

MasterCard's IMQ Mandates require Paycom to alter its business model in a way that will

make it impossible for Paycom to continue processing payment transactions for its website customers.

(Compl. ¶ 126-131.)  These customers will then have to deal directly with MasterCard's acquiring

members exposing each of them to the fines and penalties imposed by MasterCard's unlawful

chargeback system.  (Compl. ¶ 135.)  In addition, these rules remove the threat that Internet merchants

like Paycom potentially pose as platforms for alternative forms of payment that can directly compete

against MasterCard.  (Compl. ¶ 136.)

## III.  ARGUMENT

### A.    **Applicable Standard**

A defendant seeking to dismiss a complaint carries a heavy burden.  It can only prevail if it

shows "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would

entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).  In considering the motion, the

court must accept the factual assertions in the Complaint as true, construe plaintiff's allegations liberally

and draw all reasonable inferences in favor of the plaintiff.  *Zinermon v. Burch*, 494 U.S. 113, 118

(1990); *Charles W. v. Maul*, 214 F.3d 350, 356 (2d Cir. 2000); *Salahuddin v. Cuomo,* 861 F. 2d

40, 42 (2d Cir. 1988).  "And, in antitrust cases, where 'the proof is largely in the hands of the alleged

conspirators' dismissals prior to discovery should be granted sparingly."  *Hosp. Bldg. Co. v. Trs. of*

*the Rex Hosp.*, 425 U.S. 738, 746 (1976) (*citing Poller v. Columbia Broad.*, 368 U.S. 464, 473

(1962)).

**B.     MasterCard's Motion to Dismiss Should Be Denied**

MasterCard's motion essentially makes two baseless arguments.  First, that Paycom is neither a

consumer nor a competitor in the relevant markets asserted in the Complaint, and therefore, it lacks

standing to bring its claims.  Second, that Paycom has failed to allege injury to competition.  Neither

assertion can withstand scrutiny.

**1.     *Paycom Has Alleged Facts Sufficient to Support its Section 1 Claims***

*(a)     The Sufficiency of Paycom's CPP Claim*

MasterCard's challenge to Paycom's CPP claim is twofold.  First, MasterCard argues that

Paycom has failed to allege antitrust injury because Paycom is not a consumer of MasterCard payment

card services.  And second, MasterCard argues that Paycom lacks antitrust standing because its

alleged injuries are "indirect" and "highly speculative."  (MC Mem. at 16-18.)  MasterCard is wrong on

both counts.

With regard to antitrust injury, Paycom has clearly and repeatedly alleged in the Complaint its

role as a merchant/purchaser of MasterCard payment card services.  Paycom, not its webmaster

clients, contracts with a MasterCard acquiring member bank to purchase MasterCard payment card

services.  (Compl. ¶ 40.)  Paycom, not its webmaster clients, accepts MasterCard transactions from

12

consumers and directly pays the merchant discount (including MasterCard interchange) associated with those purchases.  (Compl. ¶¶ 40, 45.)  Paycom, not its webmaster clients, directly bears the fines and fees associated with MasterCard's onerous chargeback regime.  (Compl. ¶ 82, 89, 95-96, 113-19.) And, MasterCard classifies Paycom, not its webmaster clients, as a merchant in its system.[3]  (Compl. ¶ 129.)

With regard to antitrust standing, Paycom has clearly alleged a direct nexus between Paycom's injury and the CPP.  Put simply, the CPP has prevented Discover from achieving sufficient scale to challenge or restrain MasterCard's market power over merchants such as Paycom, or from otherwise acting as a competitive constraint on MasterCard's anticompetitive conduct.  (Compl. ¶¶ 73-74.) Paycom not only alleged this direct link between the CPP and injury to merchants, but it has also been established as a matter of law:

> American Express and Discover are forced to operate as single issuer networks, limiting their transaction and issuance volume and stunting their competitive vitality.  Network        services output is necessarily decreased and network price competition restrained by the [CPP at 2.10(e)] . . . ."

*U.S. v. Visa/MasterCard*, 163 F. Supp. 2d at 379.

> Not only issuers and card consumers but also merchants would benefit from an increase in competition among general purpose card networks, because merchants, as well as issuers, are consumers of network services.... Moreover, enhanced competition from American Express and Discover would likely cause [MasterCard and Visa] to be more responsive to the interests of merchants."

---

[3]        Since Paycom is directly harmed by MasterCard's conduct, there is no threat of duplicative recovery in this case.  To the extent that Paycom passes along all or part of the supra-competitive interchange and chargeback fees to its website clients, any claims they might have against MasterCard would be barred by the indirect purchaser rule.  *Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977).

*Id*. at 396.[4]

As a merchant/purchaser of MasterCard payment card services, Paycom clearly has standing to challenge the CPP.  *See, e.g., U.S. v. Visa/MasterCard* 344 F.3d at 239 ("in the market for general purpose card network services, [Visa, MasterCard, American Express and Discover] are the sellers, and issuers of cards and merchants are the buyers");  *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238, 2003 WL 1712568, at *6 (E.D.N.Y. Apr. 1, 2003) ("The merchants are direct consumers of [MasterCard and Visa's] debit card services and are directly injured by their allegedly anticompetitive conduct.  Accordingly, the merchants have standing for purposes of the antitrust laws."); *Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992, 999 n.2 (N.D. Cal. 2003) (recognizing standing based on merchant allegations that "lack of competition between [MasterCard and Visa] acquiring member banks causes injury by inflating merchant discounts").

MasterCard tries to avoid Paycom's CPP claim by categorizing Paycom as "an agent of Internet websites" with claims that "are merely derivative of any claims they may have." (MC Mem. at 16-18.)  This ignores Paycom's direct merchant customer relationship with MasterCard and its acquiring members.[5]  Likewise, MasterCard's "trickle-down" theory of antitrust injury ignores the

---

[4]     Notably, in discussing Discover's inability to make significant competitive inroads in the face of the CPP (and Visa's bylaw 2.10(e)) the court highlighted Discover's merchant friendly features, including its less onerous chargeback regime.  *Id.* at 389 ("Discover has taken steps to increase its merchant coverage . . . by simplifying fraud and chargeback rules as compared with the associations, and improving Discover's price to merchants.").

[5]     Because Paycom is a consumer in the market harmed by the CPP, the cases cited by MasterCard are inapposite.  *See G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d. Cir. 1995) (distributors lacked standing because their claims were merely derivative of firm that was destroyed by alleged antitrust conspiracy); *Barton & Pittinos, Inc., v. Smithkline Beecham Corp*., 118 F.3d 178, 179 (3d Cir. 1997) (no standing because advertising broker "was not a competitor or a consumer in the market"); *Gregory Mtkg. Corp. v. Wakefern Food Corp*., 787 F.2d 92, 95 (3d Cir. 1986) (no standing because plaintiff "is neither a consumer nor a competitor" in the relevant market); *Bennet v. Cardinal Health Marmac*

direct causal link between MasterCard's conduct and Paycom.  (MC Mem. at 17.)[6]  What

MasterCard seeks here is immunity from merchant antitrust challenges.  This request has already been

rejected by the courts.  *In re Visa Check,* 2003 WL 1712568, at *6; *Reyn's Pasta Bella*, 259 F.

Supp. 2d at 999 n.2.

      *(b)*      *The Sufficiency of Paycom's Chargeback Claims*

      MasterCard's challenge to Paycom's chargeback claims is equally deficient.  With this

challenge, MasterCard recycles its antitrust injury argument that Paycom is not "directly harmed" by

MasterCard's anticompetitive chargeback regime.  (MC Mem. at 19.)  Once again, MasterCard

completely sidesteps the numerous allegations in the Complaint describing Paycom's status as a direct

purchaser of MasterCard payment card services. Indeed, as the Complaint makes clear, Paycom

cannot remain viable without the ability to purchase these services.  (Compl. ¶ 47.)

      That is why Paycom has no choice but to endure MasterCard's chargeback scheme under

which Paycom -- not its webmaster clients -- bears directly all the risk and liability for fraudulent

---

*Distribs., Inc.*, No. 02 CV 3095, 2003 WL 21738604 (E.D.N.Y. July 14, 2003) (derivative injury case);.

      If Paycom were alleging injury to competition at the webmaster level, its injuries would be derivative (as it is neither a consumer nor a competitor in that market) and these cases would be on point.  But that is not what Paycom has alleged. Paycom is a consumer in the markets harmed by the CPP.  By directly contracting with MasterCard acquiring member banks, Paycom purchases an input -- MasterCard (and other electronic payment services) -- that it supplies to its downstream website clients "who lack the technical expertise and resources to directly accept MasterCard and Visa transactions."  (Compl. ¶ 41.)  If Paycom purchased widgets that its downstream clients incorporated into their manufactured products, its standing to pursue claims regarding the widget market would be beyond question.  The same is true here.

      [6]      Moreover, a showing that Paycom's website clients would have made more sales with Discover cards, and that Paycom would have earned higher fees, two necessary links in MasterCard's "trickle down" chain, have nothing to do with the injury the CPP has inflicted on Paycom.  Similarly unavailing are the inapposite cases MasterCard relies on to support its argument that Paycom's CPP claim is speculative or indirect.  *See, e.g., Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104 (1986) (plaintiff in private Section 7 challenge to merger of its comp *Ill. Brick*, 431 U.S. 720 (indirect purchasers do not have standing to sue for damages); *Triple M. Roofing Corp. v. Tremco, Inc.*, 753 F. etitors failed to allege antitrust injury when its threatened losses were the result of increased competition)*;* 2d 242 (2d Cir. 1985) (no standing because plaintiff's "bizarre" and "speculative" theory based on contention that its winning bid was "too low" because prices were supra-competitive due to purported antitrust conspiracy).

transactions.  (Compl. ¶¶ 76-82.)  Paycom must give the funds back when it incurs a chargeback.  *Id*.

Paycom must pay the associated fines and penalties.  (Compl. ¶¶ 83-96.)  And Paycom must expend

the substantial resources needed to employ excessively aggressive and inefficient measures to combat

fraud because MasterCard and its member will not.  (Compl. ¶¶ 113-19.)

MasterCard also attacks Paycom's chargeback claim for failing to allege harm to competition.

Yet Paycom has devoted entire sections of its complaint to detail just that.  *See*, *e.g.*, (Compl. ¶¶ 120-

22; 138-39.)  These allegations set forth a plethora of facts showing that MasterCard's chargeback

regime has raised prices (*e.g.,* supracompetitive chargeback fees and penalties), reduced output (*e.g.*,

fewer transactions) and lowered quality (*e.g.*, higher fraud) in the market for credit card (and/or credit

and T & E card) services to merchants.

For example, the Complaint explains how MasterCard's chargeback system rewards its

members with supra-competitive interchange and chargeback fees.  (Compl. ¶¶ 82, 109-12.)  It

details how these supra-competitive fees have created perverse incentives that motivate MasterCard

and its members to avoid taking adequate measures to protect CNP merchants and consumers against

fraud.  (Compl. ¶¶ 75, 109-12, 120.)   It states how these perverse incentives have limited output by

forcing CNP merchants to take inefficient and overbroad measures to combat fraud.  (Compl. ¶¶ 118-

19, 121.)  And it describes how MasterCard and its members' failure to reduce CNP fraud has

undermined consumer confidence in the security of MasterCard transactions over the Internet, further

limiting output.[7]  (Compl. ¶ 122.)   These allegations of price increases, output reductions and

---

[7]        MasterCard also misconstrues Paycom's allegations.  Paycom has not alleged that MasterCard's "zero liability" policy violates the antitrust laws.  (MC Mem. at 19.)  Rather, Paycom alleges that MasterCard's "zero liability" policy encourages the "I didn't do it fraud" that injures CNP merchants like Paycom because cardholders (and consumers generally) are unaware of the costs of these policies and the chargebacks they encourage.  (Compl. ¶ 108.)

reductions in quality are the very type of competitive injury "the antitrust laws were intended to prevent

. . . ." *Brunswick*, 429 U.S. at 489.[8]

In addition, Paycom's allegation that MasterCard and it members have agreed not to compete

regarding CNP fraud, without more, states a sufficient injury to competition to survive a motion to

dismiss.  (Compl. ¶ 75.)  As the Second Circuit recently held,

> Visa U.S.A. and MasterCard, however, are not single entities; they are consortiums of
> competitors.  They are owned and effectively operated by some 20,000 banks, which
> compete with one another in the issuance of payment cards and the acquiring of
> merchants' transactions.

*U.S. v. Visa/MasterCard*, 344 F.3d at 242.  In other words, when MasterCard and its members

agreed not to compete regarding CNP fraud, numerous horizontal competitors agreed to limit

competition.  It is hard to imagine a more explicit restraint on competition.  Agreements among the

MasterCard membership not to compete "are exemplars of the type of anticompetitive behavior

prohibited by the Sherman Act." *Id.*

---

[8]        MasterCard's injury to competition argument is principally based on Paycom's allegation that if Paycom
were unable to accept MasterCard, consumers would readily switch to Paycom's competitors.  (MC Mem. at 18-19, *quoting*
Compl. ¶ 60.)  This allegation is an example of MasterCard's market power over Paycom.  It has nothing to do with injury to
competition, particularly the higher prices, lower output, and reduced quality of MasterCard payment card transactions to which
all CNP merchants are exposed. To the extent MasterCard is suggesting that this allegation shows that consumers have not been
injured by MasterCard's conduct, this position is also flawed.  The Complaint is replete with examples of injury to end
consumers.  (Compl. ¶¶ 109-12 (more fraud), ¶¶ 118-19, 121 (less output), ¶ 122 (less consumer confidence in the Internet).)
And injury to consumer welfare in antitrust, in any event, encompasses reductions in output and efficiency that may only
indirectly affect the end consumer.  *See* Robert H. Bork, *The Antitrust Paradox* 107-15 (1978).

Furthermore, Paycom's claim that MasterCard and its member banks have agreed to fix the price of the fines CNP merchants are forced to pay states a *per se* claim for which injury to competition is presumed.  The *per se* rule applies to "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."  *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958).  When *per se* treatment applies to a restraint of trade, the practice is deemed to be anticompetitive, and thus, on a motion to dismiss, injury to competition is presumed once the agreement has been alleged.[9]

Paycom has alleged a price-fixing conspiracy between MasterCard and its acquiring member banks.  MasterCard has deliberately set its chargeback fines at levels that force acquirers to pass them along to merchants.  (Compl. ¶ 85.)  As a result, these fines and penalties are virtually always passed along to CNP merchants.  *Id*.  MasterCard has forced its acquirers to agree to impose these fines and penalties on merchants like Paycom.  Such price-fixing -- which places an effective floor on the price of such fines and penalties to merchants -- has long been recognized as a *per se* violation of the antitrust laws.  *See Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 407-08 (1911)

---

[9]        MasterCard attempts to avoid Paycom's *per se* claims by claiming immunity from the *per se* rule because of its joint venture status.  (MC Mem. at 13.)  This is not the law.  The rules and policies of joint ventures or network systems are not immune from *per se* treatment.  When such rules and policies are nothing more than naked restraints that limit output and raise prices, they are *per se* illegal.  *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951) ("Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.'"), *overruled on a different point of law by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); *SCFC ILC, Inc. v. Visa U.S.A., Inc*., 36 F.3d 958, 964 (10ᵗʰ Cir. 1994) ( "we do not read the [Supreme] Court's precedent involving joint ventures to imply any special treatment or differing antitrust analysis"); *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 11 (1ˢᵗ Cir. 1979) ("[J]oint ventures which partake of behavior identified as inherently pernicious to competition such as price fixing or territorial allocations will be judged under the *per se* rule rather than the rule of reason.").

(minimum vertical price-fixing is *per se* unlawful because it restricts "the freedom of trade on the part of dealers").[10]

      (c)    *The Sufficiency of Paycom's Cross-Border Acquiring Claim*

MasterCard's injury to competition challenge to Paycom's cross-border acquiring claim also fails because of the *per se* nature of this claim.   MasterCard's cross-border acquiring rules constitute a market allocation scheme among MasterCard members -- banks "which compete with one another in the . . . acquiring of merchants' transactions" (*U.S. v. Visa/MasterCard*, 344 F.3d at 242) -- that are horizontal competitors.  (Compl. ¶ 125.)  Such schemes are *per se* violative of the antitrust laws, and thus injury to competition should be presumed.  *Palmer v. BRG of Ga., Inc*., 498 U.S. 46 (1990); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972) ("This Court has reiterated time and time again that 'horizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.'  Such limitations are *per se* violations of the Sherman Act.").[11]

In any event, Paycom has clearly detailed how these rules have injured competition. MasterCard's cross-border acquiring rules prevent non-U.S. banks from competing in the United

---

[10]     For these reasons, unlike the cases cited by MasterCard, this case simply cannot be described as one where the allegations of injury pertain to the plaintiff and not the market as a whole.  *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296 (E.D.N.Y. 2001) (dismissal as plaintiff merely alleged injury to it and not to competition); *Falstaff Brewing v. Stroh Brewing Co.*, 628 F. Supp. 822, 827-281(N.D. Cal. 1986) (same).

[11]     Because they are naked restraints of trade, the cross-border acquiring rules will not escape *per se* treatment merely because they were enacted within the rubric of the MasterCard association.  *Timken, 341 U.S. at* 974-75.  Only MasterCard rules that are necessary to the functioning of the MasterCard network and the development and marketing of a product -- the MasterCard system --  that is distinct from anything the individual member banks could have offered themselves may be evaluated under the rule of reason.  *See Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents,* 468 U.S. 85, 101 (1984) (rule of reason applies when "horizontal restraints on competition are essential if the product is to be available at all"); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("joint ventures between competitors to market a product different from anything an individual competitor could sell" analyzed under the rule of reason); *Nat'l Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592 (1986).  The cross-border acquiring rules -- which do nothing but restrain competition -- do not meet this stringent standard.

States to provide acquiring services to Internet merchants.  (Compl. ¶ 124.)  They have insulated U.S. banks that provide acquiring services to Internet merchants from foreign competition.  (Compl. ¶ 125.) They have prevented numerous foreign acquirers from providing acquiring services to U.S.-based Internet merchants such as Paycom.  *Id.*  They have forced Paycom and other Internet merchants to deal with a limited universe of acquirers.  (Compl. ¶ 123.)  They have resulted in increased prices and decreased output.  (Compl. ¶ 125.)  And they have supplemented and reinforced the anticompetitive market structure that MasterCard has imposed on CNP merchants.[12]  (Compl. ¶ 125.)

MasterCard's contention that the provision of acquiring services to Internet merchants is competitive because it purportedly has 25,000 members is unfounded.  (MC Mem. at 20.)  This 25,000 figure is not limited to U.S. banks and includes the very banks that are precluded by the cross-border acquiring rules from competing in the U.S.  (Compl. ¶ 123.)  This figure also includes thousands of banks that do not provide acquiring services of any kind.  (Compl. ¶ 62.)  And it includes the many banks that cannot provide acquiring services to Internet merchants because of the onerous capital and operational requirements imposed by MasterCard on acquirers for Internet merchants.  *Id.*  As a result, Internet merchants such as Paycom have severely limited options in choosing acquiring banks and must

---

[12]    None of the cases MasterCard cites to support dismissal of this claim advances its argument.  In *Flash Electronics, Inc. v. Universal Music & Video Distrib. Corp.*, -- F. Supp. 2d —, 2004 WL 764584 (E.D.N.Y. Mar. 31, 2004), the Court rejected the defendants' contention that the case should be dismissed for failing to allege injury to competition because the plaintiff there, just like Paycom here, alleged that the purported restraint of trade increased prices.  Accordingly, this case actually undercuts MasterCard's motion.  In any event, neither *Flash Electronics* nor any of the other cases MasterCard cites, involved a market allocation scheme where injury to competition is presumed.  These other cases involved markets where the court found numerous competitors and healthy competition.  This finding stands in stark contrast with the market "limited to very few acquiring options" that Paycom alleges here.  (Compl. ¶ 123.)  *See, e.g., Prod. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 664 (7th Cir. 1982) (summary judgment finding of no harm to competition as there was a sufficient number of competitors "to assure . . . a competitive price and quality")*; Falstaff Brewing*, 628 F. Supp. 822, 828 ("Indeed, it is the large number of competitors and their relative power in the subject market, U.S. domestic beer brewing and sales, which precludes plaintiffs' claims . . . .").

therefore accept MasterCard acquiring services at high prices and unfavorable terms.  (Compl. ¶ 140.)

MasterCard also argues that Paycom failed to show actual injury because it has been able to contract with a MasterCard acquiring member bank in the U.S.  (MC Mem. at 20.)  In effect, MasterCard is arguing that Paycom cannot have a claim unless it is completely barred from participating in this market.  Given Paycom's clearly sufficient allegations of injury to itself and competition, this argument should be disregarded.[13]

(d)     The Sufficiency of Paycom's IMQ Mandates Claim

MasterCard offers two arguments against the legal sufficiency of this claim.  First, MasterCard asserts that this claim must fail because Paycom currently accepts MasterCard transactions.  (MC Mem. at 21.)  Second, MasterCard claims that Paycom is not a competitor in the relevant market at issue because "it must receive payment processing services from a MasterCard acquirer" to compete.  (MC Mem. at 22.)  Both arguments are baseless.

First, the fact that Paycom currently accepts MasterCard is irrelevant.  MasterCard's reinterpreted rules threaten to destroy Paycom if it continues to compete in the market.  Such threatened injury is plainly sufficient to state a claim for injunctive relief under Section 16 of the Clayton Act.  *See Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.*, 246 F.3d 752, 755-56 (5th Cir. 2001); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998)

_____

[13]     MasterCard's arguments that Paycom has failed to allege that foreign acquirers would have done business with Paycom and were not precluded from establishing U.S. subsidiaries are equally baseless.  (MC Mem. at 5.)  To survive a motion to dismiss, all Paycom needs to allege is that the absence of foreign competition harmed competition and Paycom.  It has done just that.  (Compl. ¶¶123-25, 140.)  Whether foreign acquirers would have done business with Paycom or could feasibly have incorporated in the U.S. is irrelevant.

21

(holding that § 16 of the Clayton Act "requires proof only of 'threatened loss or damage'"). In any event, this threat has already materialized as these rules have resulted in the withholding by Paycom's acquiring bank of hundreds of thousands of dollars owed to Paycom.  (Comp. ¶ 132.)

Second, the fact that Paycom must contract with a MasterCard acquirer to compete also is besides the point.  The Complaint alleges that Paycom and MasterCard acquirers provide processing services -- such as ensuring the functionality of their websites, and providing back-office risk management and customer service functions --  that are reasonably interchangeable for Internet merchants.  (Compl. ¶¶ 41, 44, 46, 53.)  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("outer boundaries of a product market are determined by the reasonable interchangeability of use . . . between the products and substitutes for it").  This allegation of competition between Paycom and MasterCard acquirers is sufficient to survive this motion.[14]

Moreover, Paycom's allegation that it directly competes against MasterCard's acquiring members is readily apparent from its group boycott claim.  Under this group boycott between MasterCard and its members, the IMQ Mandates prohibit Paycom's continued acceptance of MasterCard unless Paycom withdraws from the market and delivers its customers to MasterCard members who, instead of Paycom, will perform processing services for them.  (Compl. ¶ 129.)

---

[14]      MasterCard's argument invites the Court to make a finding of fact that is improper on a motion to dismiss. This is apparent from *Barton & Pittinos*, 118 F.3d 178, the case MasterCard cites to support its position.  *Barton & Pittinos* held, on a summary judgment motion, that a determination of whether a firm competes in the market depends on how the market is defined.  *Id.* at 182.  That fact intensive question, which has not been raised by MasterCard in this motion, is improper on a motion to dismiss.  *Todd v. Exxon Corp*., 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

In other words, MasterCard is offering Paycom a Hobson's Choice: either it can deliver its clients to competitors in the market for payment card processing services to Internet merchants or destroy its business model.  *Id.*   Because Paycom competes with MasterCard acquirers, this unlawful threatened group boycott will harm competition (and destroy Paycom) if it is carried out.  (Compl. ¶¶ 134.)  Concerted refusals to deal, such as the one alleged here, which involve competitors that possess "market power or exclusive access to an element essential to effective competition" are *per se* violative of the antitrust laws.  *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 296 (1985).[15]

### 2.   Paycom Has Alleged Facts Sufficient to Support its Monopolization Claims

MasterCard's principal argument against Paycom's Section 2 monopolization claims is that Paycom has failed to allege a market share sufficient to support a finding of monopoly power.  (MC Mem. at 22-23.)  But market share is only a surrogate for measuring monopoly power, and is only necessary when direct evidence of this power -- the power to control prices or exclude competition -- is absent.  *U.S. v. Visa/MasterCard*, 344 F.3d at 239 (*citing U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956)); *Broadway Delivery Corp. v. United Parcel Serv.,* 651 F.2d 122, 126-27 (2d Cir. 1981)*; K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F. 3d 123, 129 (2d Cir. 1995).[16]  Both examples of this direct evidence are alleged in the Complaint.

---

[15]      Paycom has alleged that MasterCard is a consortium of horizontal competitors -- some of whom compete with Paycom -- that collectively have market power.  (Compl. ¶¶ 54-67.)  And it has alleged that MasterCard controls an input -- MasterCard acceptance -- that is essential to effective competition in the market for payment card processing services to Internet merchants.  (Compl. ¶¶ 47, 60.)  These allegations plainly state a *per se* group boycott claim.

[16]      MasterCard contends that, because *U.S. v. Visa/MasterCard* involved a Section 1 claim, its findings regarding market power are inapposite to a Section 2 claim.  (MC Mem. at 23.)  This argument ignores the trend in the Second Circuit towards converging the standards for substantial market power and monopoly power under Sections 1 and 2 of the

MasterCard has had (and continues to have) power over price in the general purpose credit (or credit and T & E) card market.  (Compl. ¶ 150.)  This evidence of power over price was highlighted by the court in *U.S. v. Visa/MasterCard*, where the Court found that "MasterCard [has] recently raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result."  *U.S. v. Visa/MasterCard*, 163 F. Supp. 2d at 340; (Compl. ¶ 56.).[17]  Evidence of this power also comes from MasterCard's price discrimination between different classes of merchants, with CNP merchants such as Paycom generally paying the highest fees.  (Compl. ¶ 57.)  Moreover, the Complaint alleges that this power is protected by the high entry barriers in the market.  (Compl. ¶ 67.)

MasterCard also has the power to exclude competition.  The CPP prohibits MasterCard member banks -- which comprise virtually all the major banks in the United States -- from issuing the cards of competing general purpose credit or T & E card programs.  (Compl. ¶¶ 63, 69.)  As a result, the CPP has restrained competition from American Express and Discover in the general purpose credit (or credit and T & E) markets, and completely foreclosed those networks from the debit market.  (Compl. ¶¶ 70-71.) (*citing U.S. v. Visa/MasterCard*, 163 F. Supp. 2d at 379.)

MasterCard's focus on market share is an attempt to elevate indirect evidence of market power over direct evidence of this power.  Such a mechanical and superficial approach to evaluating market

---

Sherman Act.  This is apparent from the fact that, in *U.S. v. Visa/MasterCard,* the Second Circuit cited a leading Supreme Court monopolization case -- *E.I. duPont* -- to articulate the standards for market power in a Section 1 case.  *See also K.M.B. Warehouse Distribs., Inc.,* 61 F.3d at 129 (section 1 case citing *Broadway Delivery*, a leading Second Circuit Section 2 case, for definition of market power); *Int'l Distrib. Ctrs. Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 791 n.3 (2d Cir. 1987) ("'Market power' is a synonym for 'monopoly power'.").

[17]     While MasterCard claims the court's market power finding in *U.S. v. Visa/MasterCard* was merely *dicta*, it was actually central to its ruling that the CPP violated Section 1.

power was rejected by the Supreme Court in *Indiana Federation of Dentists* where it held that "the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *F.T.C. v. Ind. Fed'n of Dentists,* 476 U.S. 477, 460-61 (1986) (*citing* 7 P. Areeda, ¶ 1511 *Antitrust Law,* at 429 (1986)).[18]  Since Paycom has alleged such detrimental effects -- including MasterCard's imposition of supra-competitive prices, its reduction of output and its exclusion of rivals -- it has properly stated a monopolization claim.[19]

## IV.  CONCLUSION

For the foregoing reasons, MasterCard's motion to dismiss should be denied.

Dated:  New York, New York            CONSTANTINE & PARTNERS
        May 26, 2004

---

[18]    *See also Reazin v. Blue Cross and Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) ("We prefer the view that market share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power."); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98-99 (2d Cir. 1998) (*citing Broadway Delivery*, "[t]he trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence").  None of the cases cited by MasterCard involved allegations or findings of direct evidence of market power.  For example, *AD/SAT v. Associated Press*, 181 F.3d 216, 229 (2d Cir. 1999), found a 33% share to be insufficient to show a dangerous probability of market power because, unlike this case, barriers to entry were low and there were not countervailing factors that suggested that the defendants market share understated its real economic power.  Similarly, in *Tops Markets,* the Second Circuit declined to find that the defendant wielded monopoly power because there was no evidence that the defendant had power over price, the power to exclude and barriers to entry were low.

[19]    MasterCard's other challenges to Paycom's Section 2 claims are equally flawed.  With respect to standing and antitrust injury, Paycom has clearly alleged its status as a direct purchaser of MasterCard payment card services, and has detailed how it directly bears the anticompetitive effects of MasterCard's CPP and IMQ mandates. Compl. ¶¶ 72-72, 126-136.  Contrary to MasterCard's claim, the IMQ mandates do not increase interbrand competition.  (MC Mem. at 24.)  Rather, they have the exact opposite effect.  Precluding Paycom from providing processing services to Internet merchant will reinforce MasterCard's market power over these merchants by forcing them to deal with the MasterCard system individually.  (Compl. ¶ 135.)  MasterCard's assertion that Paycom has failed to allege antitrust injury and standing because it has not alleged facts showing its preparedness to enter the market also is belied by the Complaint.  These rules will rupture Paycom's relationships with numerous Internet merchants for which it currently processes.  (Compl. ¶¶ 42, 47.)  Such relationships are the essential first step in launching an alternative payment platform or brand.

By:_____

    Jeffrey I. Shinder (JS-5719)

    Gordon Schnell (GS-2567)

    Lloyd Constantine (LC-8465)

    Reiko Cyr (RC-4323)

    Jean Kim (JK-8235)

477 Madison Avenue

New York, New York 10022

(212) 350-2700

(212) 350-2701